E. S. STOTTS, Appellant, v. WILLIAM FAIRFIELD and EMMA FAIRFIELD, Appellees.

**Corporations:** SALE OF STOCK: FRAUDULENT REPRESENTATIONS. Mere 1 expressions of opinion touching the value of a thing sold, not involving any statement of fact as to its value, do not as a general rule constitute fraud. Where, however, the director of a corporation, with knowledge of its assets and the nature and character of its business, the amount of its capitalization and that a large part of its stock, which was either worthless or not demonstrated to be of any value, was issued to its manager; that the corporation had no funds except as realized from the stock; that its total property did not exceed one-half its capitalization, and that the success of its proposed business had not been demonstrated, his statement that the stock was worth fifty per cent of its par value and would be worth one hundred per cent, when taken in connection with the fact that the manager owned a majority of the stock, were not mere expressions of opinion but constituted actionable fraud.

**Same:** FRAUDULENT CONCEALMENT·OF FACTS. Mere silence in regard 2 to matters of which it is not the duty of one to speak does not of itself constitute fraud, but where the party has reason to believe that his silence will mislead, or where he purposely conceals facts which it was his duty to disclose, or where a disclosure would tend to contradict or show that statements made by him were untrue, and he knows that the other party is relying upon his statements as true, then his silence may be an element of fraud.

**Same:** RESCISSONS: RESTORATION: EVIDENCE. One seeking to rescind 3 a contract on the ground of fraud·must offer to return the thing received within a reasonable time. In this action upon a note given for the purchase price of corporate stock, to which defendant pleaded the false representations of the seller regarding the value of the stock, evidence that defendant produced the stock in open

court and waived any claim thereto was sufficient to warrant a finding of timely offer to return the stock.

**Same.** The question of whether the party to whom tender was made was prejudiced by the delay may be considered in determining whether the tender was within a reasonable time.

**Same:** FRAUD: EVIDENCE. In an action involving false representations in the sale of corporate stock, evidence of similar transactions and statements concerning the sale of similar stock is admissible, as tending to show knowledge of the character and value of the stock, and also as tending to show a scheme to defraud.

**Same:** NEGOTIABLE INSTRUMENTS: BONA FIDE HOLDER: EVIDENCE. In the absence of fraud in the inception of a note the burden is upon the maker to show that a transferee is not a *bona fide* purchaser, but when fraud in its inception is alleged and proved the burden shifts to the holder to show that he is a *bona fide* purchaser. In this action upon a note given for the purchase of corporate stock the evidence is held to support a finding that plaintiff, the manager and principal stockholder of the corporation, was not a *bona fide* holder.

*Appeal from Hamilton District Court.—*HON. CHAS. E. AL-BROOK, Judge.

TUESDAY, JANUARY 27, 1914.

ACTION to recover on a promissory note given for certain stock in the Stotts Signal Company, an Arizona corporation. Defense—that the note was obtained by fraud. Verdict and judgment for the defendants. Plaintiff appeals.—*Affirmed.*

*F. L. Anderson* and *Voris & Haas,* for appellant.

*D. C. Chase* and *Wesley Martin,* for appellees.

GAYNOR, J.—Plaintiff brings this action upon a certain promissory note, dated April 25, 1910, executed and delivered by these defendants to one R. P. Dodge for $2,500, and claims that before the maturity of the note, Dodge indorsed and

delivered the same to him for value. Defendants admit the execution of the note, but allege as defense thereto that there was fraud in the inception of the note constituting a complete defense thereto; that said note was obtained by false and fraudulent representations made by Dodge to these defendants; that the consideration of said note was 5,000 shares in what purported to be an Arizona corporation, known as the Stotts Signal Company; that at the time the note was made Dodge represented that the stock was worth $1 per share upon the market, while in truth and in fact it was, at the time, absolutely worthless; that Dodge further stated, as an inducement to the plaintiff to take said stock and execute said note, that the said company had patents for manufacturing and installing signals on railroads; that it had a large and valuable plant at Marion, Iowa, free from incumbrances; that the company had plenty of money to run the business; that no indebtedness would be incurred by the company; that said stock was paying a dividend of 10 per cent. per annum; that a dividend would be declared upon said stock within 60 days from the taking of the note, and stated, further, that numerous purchasers of stock in said company had made an expert examination of the signals which were being manufactured, and that such examination had resulted in a determination by said purchasers; that the signals were valuable, and would accomplish the purpose for which they were intended; that the stock was being sold to no one for less than fifty cents a share, while in truth and in fact the same had been sold for twelve cents a share. Plaintiff says that all the statements and representations made by Dodge were false and were known by him to be false, and that the defendants relied upon such statements in taking the stock and executing the note. Defendants further say that Dodge represented to them that the shares of stock, so received by them were worth on the market $1 per share, and he then and there expressly warranted the stock to be worth $1 per share upon the market, and further represented and stated to these defendants that

before the note became due he could and would sell sufficient of the stock, purchased by these defendants, to pay the notes, and expressly agreed that he would not transfer the note to any one, but would retain it himself, and that these defendants would never be required to pay any money on said note, except as the money was realized on the stock for which the note was given; that the said Dodge made all said statements, warranties, and representations for the purpose of inducing the defendants to execute the note in suit. Defendants further allege that the plaintiff herein had due notice and knowledge of all the matters herein alleged, and that the note was not taken in good faith by the plaintiff, or for a valuable consideration. To this answer the plaintiff filed what is practically a general denial. Upon the issues thus tendered the cause was tried and submitted to a jury, and verdict returned for the defendants, and, judgment being entered thereon, the plaintiff appeals.

At the conclusion of all the testimony the plaintiffs filed a motion for a directed verdict, which was by the court overruled. Thereupon defendants filed an amendment to their answer pleading a partial defense, alleging that if the stock had any value at all, it did not exceed one cent on the dollar, and thereupon asked that they be allowed the difference between the value of the stock, as warranted by Dodge, and its actual value, as found from the evidence, as an offset against the note. The undisputed evidence upon the trial showed that the Stotts Signal Company was an Arizona corporation; that the plaintiff, Stotts, was a director in said company and general manager; that the company issued 5,000,000 shares of stock at $1 a share; that Stotts received 3,000,000 of the stock issued as a consideration for his patents. The evidence tended to show that Stotts was not the patentee of these devices; that none of these devices had ever been sold, and no contract had ever been entered into with any company for the use of these devices; that the company was organized for the purpose of manufacturing and install-

ing signals on railroads known as automatic railroad signals. It appears that at the time this suit was tried the company was not doing any business, not manufacturing any of the devices; that Dodge was a director in said company. The evidence tended to show that Dodge had sold considerable of this stock at prices ranging from ten cents to fifty cents per share; that in some instances he took live stock in exchange for shares of stock, land in Dakota without seeing it, shares in mining enterprises, in wireless telegraph. There is evidence tending to show that the patents claimed by Stotts were an infringement on the union switch signal; that this Stotts Company was afterwards reorganized, and new models and patents obtained; that the company has never sold any signals; never installed any, in any railroad, and never had any contract to do so; that it had no money except what it obtained from the sale of stock. Dodge claims that at one time he loaned the company $6,000 realized from the sale of stock belonging to himself; that much of the stock handled by Dodge was reissued in blank to him. Dodge claims that he paid for much of the stock, and for this particular stock, and was the owner of it. He could not, or would not, tell what he paid for it at any time, or how. There is evidence tending to show that Dodge warranted or guaranteed the stock to these defendants to be worth on the market, fifty cents per share. The evidence tended to show that he stated to the defendants substantially the character of the property held by it at Marion, but did not state to them the fact that Stotts was the owner of $3,000,000 of the stock. There is evidence that Dodge represented to the defendants that the Stotts Signal Company was a going concern and prosperous. There is evidence from which the jury might well have found that this stock issued to the defendants was practically of no value; that the patents were of no value; that the only property the company had as a basis for this stock, was the machinery at Marion, worth about $10,000; four lots on which was a coal shed, a couple of outbuildings; a one two-story

building 40x90; an oilhouse; a small office in which was a desk, a table, some chairs and a vault, and about eighty or ninety signals which it still has on hand.

One Lampman, called as a witness, testified as follows:

I have been a member of the board of directors of the Stotts Signal Company and a stockholder for three and one-half years. · E. S. Stotts has been the manager up until a few months ago, the most of the funds that came into the hands of the company was from the sale of stock, no signals were sold. I am secretary now. May be stock was sold from ten cents up; I don't know what amount was sold for ten cents, or what amount was sold for twenty-five cents, or what was sold for $1; I knew some was sold for ten cents and some for twenty-five cents; none was sold for less than ten cents by the company. Q. Was there any sold for less than ten cents by anybody connected with the company to your knowledge? A. Yes, sir. Before the year 1910. Q. And since that time? A. Yes, sir. Perhaps a year and a half ago. We thought sometimes it looked pretty good, then in a few months it wasn't so good again. In April 1, 1910, the company had some property at Marion. I don't know that it had the deed at that time; it had some patents. I don't know that the patents belonged to the company, or to Mr. Stotts at that time. Q. What was the value of this stock per share in April, 1910? A. I think ten cents. Q. Up to April 25, 1910, what was the condition of the company financially with regard to ready money? A. A good share of the time we were out of money. I understood at one time that some railroads would use the two position signal, but no contracts therefor were ever made. We are now working on a new design; a new company has been formed called the 'Overland Signal Company.'

The defendant, Fairfield, testified that Dodge said that the stock was worth fifty cents per share; that he would guarantee it to be worth that. Said that he relied upon the statement made by Dodge; would not have bought the stock but for it; that he did not then know the value of the stock.

Dodge testified:

I got 19,000 shares in April, 1910. Don't remember what I paid for this. This was part of the stock that had been issued to Mrs. Stotts. It was not treasury stock. It was common stock. Always paid for it before I got it. Sometimes in check, sometimes with a note. I might have sold Mr. Fairfield out of this block of stock. It was issued in blank to save work. At the time this corporation was organized, Mr. Stotts was given 3,000,000 shares for his patents. The par value was $1 per share. The corporation was capitalized at 5,000,000, and in 1906 gave Mr. Stotts 3,000,000 for his patents. I knew at the time I sold this stock to the defendant Fairfield that there had been issued to Mr. Stotts three-fifths of the capital stock of the company.

W. A. Weaver testified as follows:

I met Mr. Stotts in Buffalo in October or November, 1911. I am a mechanical engineer. He wanted such an engineer. He said it was necessary for some mechanical engnieer to be obtained so that the machines might be made marketable and acceptable to railroads. I found that he was not the patentee of these devices. He explained this by saying that he got these parties to allow him to use their names in procuring these patents. He urged me to come and make these machines marketable. He said the engineers in Marion were incompetent. When I arrived at Marion, I found these signals disassembled. I found the two position signal working perfectly. The three position failed, in my judgment, to possess any merit. Ten of the two-position signals were completed, and worked perfectly. They had eighty or ninety nearly completed.

Dodge testified that at the time Stotts took over the note in suit that he (Dodge) agreed to do the collecting; that he would collect the note.

I told him that Fairfield got 5,000 shares of stock, and had given this note for it; that he intended to help Fairfield with the note as soon as we could get to it, and as soon as we got the company on its feet, and not to interfere with Fairfield; that the note was given to Stotts for the one two-story

building and the old building and the ground on which it stood, and a little outhouse, and the ground on which the new building stood; that the company acquired this ground from Stotts in August, 1910. I turned this note over to the company, and the company turned it over to the plaintiff. The new buildings were erected in the spring of 1910.

The plaintiff further testified that Dodge said to him that before the note became due, the stock would be worth $1 per share; that the devices were all patented; that the plant was in operation; that one railroad company had offered to contract with them. At the time he sold me the stock he said it was worth fifty cents, and that he would guarantee it to be worth fifty cents.

After the evidence had all been concluded and after the motion for a directed verdict had been overruled, and the amendment to the answer filed, defendant produced the stock in open court, offered it in evidence (after the same had been identified), and said: "I bring these certificates into court for the use of the one entitled to them."

The first contention on the part of appellant is that the evidence of fraud, in procuring the note, was insufficient; that it consists of mere expressions of opinion as to the value and the future value of the stock, and are therefore not available as false representations upon which to predicate an action for damages, or to avoid the note; that representations, as to the value of stock, where they relate to no existing fact, are insufficient to be available as defense against a contract procured by reason thereof.

It is true, as a general rule, that mere statements as to the value of the thing sold, unaccompanied by any statement of fact touching the value of the property, do not constitute fraud. In this case it must be borne in mind that Dodge was in position to have, and had, knowledge of all the facts upon which the value of this stock depended. He knew that the company issuing the stock had been capitalized at $5,000,000. He

1. CORPORATIONS: sale of stock: fraudulent representations.

knew that the manager of the company had received of this
stock, $3,000,000. He knew that the patents held by the
manager, for which this stock was issued to him, were prac-
tically worthless, or at least he knew that it had not been
demonstrated that they were efficient for the purposes for
which they were patented. He knew that none of them had
been sold. He knew that all the property that the company
had was the property at the city of Marion, and yet stated
that the property was worth the amount defendants were
paying for it, and as an inducement to them to purchase
undertook to, and did, warrant and guarantee the property
to be of that value. He knew that the success of the ven-
ture was problematical. He knew that the value of the stock
depended upon the success of these patents. He knew that
the company had no money, except such as was realized
from the sale of this stock. The evidence discloses, not only
a false statement as to the value, but a statement as to its
future value which rested on no substantial basis. He not
only falsely stated facts which he must have known, from
his connection with the company, were not justified, and
could not, in the nature of things, be true touching the value
of the stock, but purposely and intentionally concealed from
the defendants facts material to be known in placing a value
upon the stock. The value of stock in any corporation de-
pends largely upon its assets. His purposed concealment
of material facts, his statements of the then value, his as-
surance as to the future value, his guaranty given to the
defendants, brings to the mind, not only a conviction that
Dodge practiced intentional fraud upon the defendants, but
did it in such a way as to justify them in relying upon the
statements made by him as to the then value. See *Brown
v. Holden*, 120 Iowa, 191; *Mauttauch v. Walsh*, 136 Iowa,
225.

It is true that the mere silence of a person, in regard
to facts which it is not his duty to disclose, does not, in it-

self, constitute fraud. But where he has reason to believe
that his silence misleads, where he purposely

**2. SAME: fraudulent concealment of facts.** conceals material facts, which it was his duty
to disclose, and where the disclosure would
be a contradiction of or tend to show that the statements made
by him were untrue, and he knows the other party is relying upon his statements as true, then his silence may be an
element of fraud.

In *Howard v. McMillen*, 101 Iowa, 457, it is said: "It is
the general rule that mere silence of a person in regard to
facts which it is not his duty to disclose is not fraudulent.
But, where silence would be misleading, a duty to speak may
arise. A person may, under some circumstances, by passive
conduct or silence, knowingly and intentionally deceive and
mislead another, and thus perpetuate a fraud." As sustaining this doctrine, see also, *Harrison County v. Ogden*,
133 Iowa, 677.

In *Hubbard v. Weare*, 79 Iowa, 688, in dealing with the
question of false representations, this court said: "It must
appear that the representations were made with intent to
wrong or injure the parties to whom made. Such intention
may be shown by direct evidence, or be inferred from the
making of the false representations knowingly. Such intention may exist, though the party making the representations
confidently believed at the time that no injury would result
therefrom. For instance, an officer of a corporation, to induce others to take stock therein, makes material representations as to its financial condition which he knows to be
false, yet in the confident belief that the corporation will soon
be as represented, and that no loss will follow; he surely
commits an intentional wrong, notwithstanding his belief.
The wrong is in inducing others to take stock in a corporation that is not as he has represented it to be. The parties
taking stock under these circumstances are entitled to shares
in a corporation such as he represented, but get shares in a
company such as it was." This case is not directly in point

with the case at bar, but the reasoning sustains the conclusions which we reach in this case.

We are of the opinion that the statement made by Dodge, touching the value of the stock and its future value, ought to be held as a statement of fact, and not an opinion, in view of the fact that he was a director in the corporation; had full knowledge of its assets; of the nature and character of the business; what it had done and what it had not done, and the uncertain nature of the patent, which was its largest asset; in view also of the fact that he knew, at the time, that Stotts was the owner of three-fifths of all the stock issued by the corporation, and that the total face value of the outstanding stock was $5,000,000. Under no theory of this record can it be said that Dodge honestly entertained the opinion that the stock of this company was worth $2,500,000, or that it even approximated that amount, and we think it affirmatively appears that Dodge made the statement to the defendants as to the value of the stock purposely, and with the intent to deceive them, and purposely concealed from them the knowledge of facts essential to a correct estimate of its value, and that his pretended guaranty was made for the purpose of confirming the defendants in the belief that his statement was true, and that the stock was of the value stated by him.

The court submitted to the jury, the following special interrogatory: "Do you find that the note in question was procured by Dodge of the defendants, by, and as a result of, fraudulent representations made by him to them?" to which the jury answered, "Yes;" and we are satisfied that this finding has support in the record.

The appellant relies on *Bank v. Fulton*, 156 Iowa, 734, but we think that case is clearly distinguishable in its facts from the case at bar.

It is next contended that the evidence shows that the stock received by the defendants was, at the time it was re-

ceived, of some value, and that to entitle the defendants to defeat recovery upon the note, even where

3. SAME: rescission: restoration: evidence.

fraud is shown, they must tender back the thing received within a reasonable time after discovering the fraud; that they failed to do this, and therefore failed to rescind the contract within a reasonable time.

It does not appear from this record that the defendants discovered the fraud pleaded against this note at any time prior to the filing of the answer. They tendered the stock upon the trial, introduced it in evidence, with a statement that they presented it for delivery to him to whom it belonged. It is true that it is the duty of one who seeks to avoid a contract on the ground of fraud to tender back the thing received within a reasonable time after discovering the fraud. This presupposes that the thing received had some value. If the thing received has no value, there is no obligation to return it. The jury practically found that the stock was of no value, and in answer to the third special interrogatory, to wit, ''Do you find that the note in suit was procured without consideration therefor?'' answered, ''Yes.'' This is another way of saying that the thing for which the note was given was of no value, and therefore no duty rested on the defendants to tender it back before bringing suit. But, even conceding that it had some value, and that it was the duty of the defendants to tender it back within a reasonable time after discovering the fraud relied upon, we think that it was a question for the jury as to whether they did so do, and this question was submitted to the jury for their determination in the sixteenth instruction given by the court. We are of the opinion, however, that when the defendants produced the stock in question in open court, and waived all claim thereto, and made the waiver a matter of record, and left the stock for the disposition of the court, a sufficient showing was made of tender to justify the jury, under all the facts of the case, in a finding that the same was tendered back within a reasonable time, and this we held in view of the character of

the property received by defendants; the uncertain value of it, under any theory of the case; the uncertainty as to its having any value at all, and the fact that, if it had any value, its greatest, and perhaps only, value could be found in the manipulation of it by the corporation and its managing officers.

A further fact to be considered in determining whether or not the tender was made within a reasonable time is the fact whether or not the rescission, at the time at which it was made, was less beneficial to the party entitled to the tender, than if it had been made earlier, or, in other words, whether the party to whom the tender was made was in any way prejudiced by the delay; whether he was put in any worse position than he would have been had the tender been made earlier. None of these are controlling facts in determining whether or not the tender was within a reasonable time, but they are facts that may be considered by the jury in determining this question.

4. Same.

As bearing upon this question, see *Schneider v. Schneider,* 125 Iowa, 1; *Bank v. Cook,* 125 Iowa, 115; *Cox v. Cline,* 139 Iowa, 133; *Cox v. Cline,* 147 Iowa, 355; *Aken v. Clark,* 146 Iowa, 440; *Moore v. Moore,* 39 Iowa, 461.

It is next contended that the court erred in admitting testimony as to similar transactions, and as to statements and representations made by Dodge to other parties in the sale of similar stock. This was clearly admissible as tending to show the knowledge of Dodge of the character and value of the property he was handling, and as tending to show a scheme to defraud, which is always admissible where the intent of the party charged with the fraud is involved in the particular transaction. It is not admissible, however, for the purpose of showing or proving that the particular representations charged in the particular case on trial were made as charged. If testimony is admissible for any purpose, it is not to be excluded though it may tend to prove some other fact in the case, to prove which it

5. Same: fraud: evidence.

is not competent. It is within the power of the court, upon request, to limit the testimony to the particular matter involved in the case to establish which it was admitted. This is elementary, and needs no authority to support it.

It is next contended that, in the absence of fraud in the execution of a note, the burden of proof is upon the maker to show that the holder is not a *bona fide* purchaser. This is

6. SAME: negotiable instruments: bona fide holder: evidence.

unquestionably the rule, but it does not apply where fraud in the inception of the contract is alleged and proven. Then the burden shifts upon the plaintiff to show that he was a good-faith purchaser in order to escape the consequences of the fraud. Whether he was a *bona fide* purchaser was a question for the jury, and submitted to the jury under proper instructions, to be determined, not only from the testimony of the witnesses touching this point, but from all the facts and circumstances disclosed by the evidence; the relationship of the parties to each other, and to the corporation issuing the stock; the manner in which the stock was secured, and from whom; the disposition made of the proceeds arising from the sale of the stock; the knowledge that the plaintiff had of the consideration for which the note was given; the nature, character, and value of the consideration; the object and purpose for which the stock was sold, all of which must have been known to the plaintiff as the manager of the corporation. It would seem almost incredible that Stotts, the plaintiff herein, manager of the corporation and a director, took this paper in good faith, for a valuable consideration, and without notice of infirmities inhering in the note. The natural inference to be drawn from the whole record is that there was some plan or arrangement between the plaintiff and Dodge whereby this should be put upon the market for the purpose of furthering the schemes of the corporation in which Stotts held a controlling interest. It appears that the corporation had no money except such as was realized from the sale of stock. The record is such, upon this point, that,

the question having been fairly and fully submitted to the jury for its determination, we cannot interfere with their finding. In support of this see *McNight v. Parsons,* 136 Iowa, 395, and cases therein cited.

Some complaint is made of the instructions given by the court. They must be considered as a whole. Examining them in the light of the record in this case, we are satisfied that they fully, fairly, and clearly present all the legal questions involved in this suit, and that no error exists therein prejudicial to the plaintiff's rights.

Upon the whole record, we find no reversible error, and the cause is *Affirmed.*

LADD, C. J., and DEEMER and WITHROW, JJ., concur.