STATE OF IOWA, Appellee, v. S. H. BEVINS, Appellant.

No. 39449.

MAY 16, 1930.

REHEARING DENIED SEPTEMBER 23, 1930.

*M. M. Cooney* and *Geiser, Donohue & Geiser,* for appellant.

*John Fletcher,* Attorney-general, *Neill Garrett,* Assistant Attorney-general, *Leon R. Layton,* County Attorney, and *Senneff, Bliss, Witwer & Senneff,* Special Counsel, for appellee.

*Jaques, Tisdale & Jaques, Gilmore & Moon, A. L. Heminger, J. C. Calhoun,* and *McCoid, McCoid & McCoid,* Amici Curiæ.

KINDIG, J.—The First State Bank of Hawkeye, during all the times here material, was a banking corporation organized under the Iowa law. S. H. Bevins, defendant-appellant, was the president thereof. It is charged in the in-  dictment that the appellant, on April 5, 1927, willfully, unlawfully, intentionally, knowingly, and feloniously received and accepted ''on and for deposit in the First State Bank of Hawkeye, Iowa, and for and on behalf of said bank, the sum of $29.85.'' Furthermore, it is alleged in the indictment that the appellant then and there ''well knew of such insolvency.'' This deposit was made by Emma Hehmke.

Foundation for the indictment is two sections of the 1927 Code. They are:

''Section 9279. No bank, banking house, exchange broker, deposit office, firm, company, corporation, or person engaged in the banking, brokerage, exchange, or deposit business, shall,

when insolvent, accept or receive on deposit, with or without interest, any money, bank bills or notes, United States treasury notes or currency, or other notes, bills, checks, or drafts, or renew any certificate of deposit.

"Section 9280. If any such bank, banking house, exchange broker, deposit office, firm, company, corporation, or person shall receive or accept on deposit any such deposits, as aforesaid, when insolvent, any owner, officer, director, cashier, manager, member, or person knowing of such insolvency, who shall knowingly receive or accept, be accessory, or permit, or connive at receiving or accepting on deposit therein, or thereby, any such deposits, or renew any certificate of deposit, as aforesaid, shall be guilty of a felony, and, upon conviction, shall be punished by a fine not exceeding ten thousand dollars, or by imprisonment in the penitentiary for a term of not more than ten years, or by imprisonment in the county jail not more than one year, or by both fine and imprisonment."

Appellant asks that the judgment of conviction be reversed. Many reasons are assigned therefor. These reasons are divided into two general subjects. One subject relates to the constitutionality of the aforesaid statutes, and the other has to do with alleged errors claimed to have occurred during the trial. Those assigned reasons for reversal raising constitutional questions are:

First: "That Sections 9279 and 9280 of the 1927 Code are unenforcible provisions of the law." Such, appellant asserts, is true because, in *Easton v. Iowa*, 188 U. S. 220, the United States Supreme Court declared that said legislation could not be applied to national banks. Because the language of Sections 9279 and 9280 is general, appellant insists that the void and unenforcible portion thereof condemned in the *Easton* case cannot be separated from those parts which might otherwise be valid and legal. Hence, appellant concludes that the entire law must fail, under the established theories of statutory construction.

Second: That said Sections 9279 and 9280 (even if the *Easton* case did not make them unenforcible) are void because in conflict with the Fourteenth Amendment to the United States Constitution, and Article 1, Section 9, of the Iowa Constitution. His reason for so contending is that insolvency, as used in the

state legislation aforesaid, is so indefinite and uncertain that it cannot be known when an act becomes criminal and punishable as such.

On the other hand, the before mentioned grounds for reversal, other than the constitutional questions just stated, have to do with the purported errors occurring during the trial, including the wrongful admission of testimony, erroneous instructions, and improper arguments. Full and careful consideration of all the propositions above enumerated, including the constitutional questions, as well as the others, compels the conclusion that appellant's contentions are without merit. For the sake of convenience, the foregoing propositions will now be considered in the order named.

I. Does *Easton v. Iowa,* 188 U. S. 220, make unenforcible Sections 9279 and 9280, above quoted? That is the first question.

In *State v. Fields,* 98 Iowa 748, the Iowa Supreme Court held that the statutory sections aforesaid included national banks and national bankers. Subsequently, the same conclusion was reached in *State v. Easton,* 113 Iowa 516. Easton, by writ of error, asked the United States Supreme Court to review the holding of the Iowa Supreme Court. Upon that review, the United States Supreme Court reversed the judgment of the Iowa Supreme Court, on the theory that legislation concerning national banks was under the control of Congress alone, and the state legislature, under the circumstances, did not have jurisdiction over such Federal institutions. Since that time, the Iowa legislature did not re-enact or in any way amend the acts involved, before the appellant in the case at bar was indicted. As before stated, the appellant uses the conclusion of the United States Supreme Court in that regard as a basis for saying that the statutory sections under consideration are now entirely unenforcible. This result is reached by appellant upon the theory that the general language contained in these sections includes national banks.

The Iowa Supreme Court, in the *Fields* and *Easton* cases, held that national banks were included. When the *Easton* case reached the Supreme Court of the United States, that tribunal accepted the statutory interpretation made by the Iowa Supreme Court, and discussed the problem accordingly. Consequently, appellant asserts that, the language of the state legislation being

broad enough in its terms to include national banks, according to the *Fields* and *Easton* cases, such portion of the phraseology which accomplished that result still remains. So, in view of the conclusion reached by the United States Supreme Court, said particular part of the law relating to national banks is void. Therefore appellant urges that these sections are entirely unenforcible, for the reason that, the language being general, the valid parts thereof cannot be separated from the invalid. Basis for this contention is founded upon principles of statutory construction.

"Statutes that are constitutional in part only, will be upheld so far as they are not in conflict with the Constitution, provided the allowed and prohibited parts are severable." *Packet Co. v. Keokuk,* 95 U. S. 80.

Again, the Supreme Court of the United States said, in *Dorchy v. State of Kansas,* 264 U. S. 286:

"A statute bad in part is not necessarily void in its entirety. Provisions within the legislative power may stand if separable from the bad. * * * But a provision inherently unobjectionable cannot be deemed separable unless it appears both that, standing alone, legal effect can be given to it, and that the legislature intended the provision to stand, in case others included in the act and held bad should fall."

Penal statutes are to be strictly construed, and appellant argues that the rule of statutory construction requiring severability is more stringent in a criminal than in a civil case. At this juncture appellant cites *Flannagan v. Jepson,* 177 Iowa 393; *Butts v. Merchants & Miners Transp. Co.,* 230 U. S. 126; *Trade-Mark Cases,* 100 U. S. 82; *Poindexter v. Greenhow,* 114 U. S. 270; *Pollock v. Farmers' L. & Tr. Co.,* 158 U. S. 601; *United States v. Reese,* 92 U. S. 214; *Employers' Liability Cases,* 207 U. S. 463; and other cases.

While it is true, generally speaking, that a criminal statute is to be strictly construed, and that, under the rules of statutory construction, the valid portion of the legislation will not be enforced unless it can be separated from the invalid, yet, when the legal can be distinguished from the illegal, the statute will be upheld. That is true even though the statute is penal in its

nature; for a statute, although penal, under proper circumstances may be so construed that the valid parts are retained and the invalid rejected. Much depends upon the circumstances and conditions. If such construction expresses the manifest desire of the legislature, it should be made. *Carey v. State of South Dakota,* 250 U. S. 118. See, also, *Latimer v. United States,* 223 U. S. 501; 6 Ruling Case Law 132, Section 131. The general principle of construction now under consideration has been many times used in determining the existence or validity of a particular civil or criminal statute.

Said proposition has two phases. One relates to the application, and the other to the subject-matter of the statute. A statute constitutional when applied to a permissive subject-matter may become unconstitutional when applied to a forbidden subject-matter. Resultantly, when considering principles of statutory construction, this important distinction must be recognized. Speaking generally, we said in *City of Keokuk v. Keokuk N. L. Packet Co.,* 45 Iowa 196, on pages 211 and 212:

"City ordinances, like statutes, will be upheld to the extent of provisions authorizing the exercise of power clearly within the scope of the municipal authority, while other provisions in excess of such authority will be held void. * * * But if the parts of the statute or ordinance be necessarily connected and dependent, the whole must fall with the void part. The rule must be extended to the case of a statute or ordinance authorizing two or more acts, one of which is within, and the other without, legislative authority. The first act, when done under such statute or ordinance, will be valid, the second void."

By an exhaustive opinion, the Supreme Court of Kansas, in *State v. Smiley,* 65 Kan. 240, 247 (69 Pac. 199, 202), declared:

"In immediate connection with the subject just discussed [statutory construction], the question arises whether, assuming the general phraseology of the statute to be comprehensive of classes of persons who cannot be rightfully included therein, the whole enactment becomes nullified thereby. The general doctrine is that only the invalid parts of a statute are without legal efficacy. This is qualified by the further rule that, if the void and valid parts of the statute are so connected with each

other in the general scheme of the act that they cannot be separated without violence to the evident intent of the legislature, the whole must fall. These rules are of everyday enforcement in the courts. * * * The instances in which the application of the rule first mentioned most usually occurs are those where separable words, clauses, sentences, or sections of the statute are stricken out, as it were, because constitutionally objectionable. *However, the rule is not limited to such instances* [the italics are ours]. It applies as well to exclude from the operation of the statute subjects and classes of things lying without the legislative intent, although comprehended within the general terms of the act, as it does to exclude parts of the verbal phraseology.''

To the same effect, see *Sunderland Bros. Co. v. Missouri Pac. R. Co.*, 101 Neb. 119 (162 N. W. 494); *McKee v. United States*, 164 U. S. 287; *Carey v. State of South Dakota* (250 U. S. 118), supra. Thus it is seen that the rule of statutory construction under consideration relates not only to the legislative subject-matter, but also to the application thereof made to certain persons or institutions. But appellant suggests that the doctrine stated in the immediately preceding sentences applies to legislation which has never been construed, but does not aid in the premises, because here the Iowa Supreme Court in the *Fields* and *Easton* cases, supra, specifically held that national banks were included within the statutory penalty. Being thus included by the Iowa courts, appellant says, they cannot now be excluded by construction. As a result of this situation, appellant urges that the rule of construction relating to the application of a general statute, as previously explained, does not refer to the facts here presented, because we are not originally construing, but considering the result of a previous construction. Obviously, the appellant misconceives the full extent of the legal principle involved. Principles of construction announced and approved by us in the foregoing discussion apply to the exact situation now presented in the case at bar. Although it is true that the problem confronting us involves the result of a previous statutory construction, yet the rules which are to solve the problem are those in this opinion approved. To illustrate, the present task confronting us involves the duty of determining whether a statute may stand and be enforced against state

bankers, although the application thereof to national bankers under the construction in the *Fields* and *Easton* cases became invalid and objectionable. There are two phases to the general problem of statutory construction, as before indicated: one relates to the elimination of certain language in a statute in such a way as to leave an enforcible remainder, while the other has to do with the excluding and preventing of the wrongful application of legislation otherwise legitimate and valid. It is with the latter phase of this rule of construction that we are now concerned. This general subject was considered by the Supreme Court of United States in *Supervisors v. Stanley,* 105 U. S. 305, wherein it was said:

"Accepting, therefore, as we must, the Act of 1866 [a state act], as construed by the Court of Appeals of New York, as not authorizing any deduction for debts by a shareholder of a national bank, is it, for that reason, absolutely void? This cannot be true in its full sense, for there is no reason why it should not remain the law as to banks or banking associations organized under the laws of the state, or as to private bankers, of which there no doubt exists a large number of both classes. * * * It would seem that, if the Act remains a valid rule of assessment for shares of state banks and for individual bankers, it should also remain the rule for shareholders of national banks who have no debts to deduct, and who could not, therefore, deduct anything if the statute conformed to the requirements of the Act of Congress. * * * The general proposition must be conceded that, in a statute which contains invalid or unconstitutional provisions, that which is unaffected by these provisions, or which can stand without them, must remain. If the valid and invalid are capable of separation, only the latter are to be disregarded. * * * *Case of the State Freight Tax* (15 Wall. 232), arose out of a statute of Pennsylvania, which attempted to impose a tax on commerce forbidden by the Constitution of the United States. The act imposed a tax upon every ton of freight carried by every railroad company, steamboat company, and canal company doing business within the state. The railroad companies who contested the tax presented a statement which separated the freight transported by them between points solely within the state, and limited to such destination, and that which was received from or carried beyond those limits. This court held

the latter to be void, as a tax on interstate commerce, and did not declare the whole tax or the whole statute void. It said: 'It is not the purpose of the law, but its effect, which we are now considering. Nor is it at all material that the tax is levied upon all freight, as well that which is wholly internal as that embarked in interstate commerce. * * * The conclusion of the whole is that, in our opinion, the act of the legislature of Pennsylvania of Aug. 25, 1864, so far as it applies to articles carried through the state, or articles taken up in the state and carried out of it, or articles taken up without the state and brought into it, is unconstitutional and void.' The same language is repeated in *Erie Railway Co. v. Pennsylvania* (id. 282), decided at the same time. Both cases were remanded to the state court for further proceedings in conformity with the opinion, which could only mean to enforce the tax on transportation limited to the state, and not on interstate commerce. This is a clear case of distinguishing between the articles protected by the Constitution of the United States and those which were not, though nothing in the language of the statute authorized any such distinction.''

Hence it is plain that the general state statutes considered by the United States Supreme Court in the *Stanley* case, when wrongfully applied by the state, entered the field of Federal prohibition; yet, when properly applied to state matters, the legislation was retained, as legal and constitutional. Equally it appears that the United States Supreme Court, after interfering with the general application of those statutes, permitted their use and operation in the fields of state jurisdiction. Reliance is made by appellant upon certain United States Supreme Court decisions construing acts of Congress. Acts of Congress are more strictly construed in this particular regard than many statutes adopted by state legislation. Explanation for that difference can be found in *State v. Smiley* (65 Kan. 240 [69 Pac. 199]), supra, where it is said that the original difference between the two governments accounts for the restricted rule in the Federal courts when construing acts of Congress. Whether that is the reason or not is immaterial at this time, because it is enough to note that Federal courts are more liberal in permitting portions of state statutes to be enforced than they are in allowing parts of congressional acts to remain operative.

Some state courts have followed the Federal rule of strict

construction suggested in *Butts v. Merchants & Miners Transp. Co.* (230 U. S. 126), supra, and similar cases. While doing this, the state courts have failed to note the liberal construction applied by the United States Supreme Court to partially valid state acts, as distinguished from partially valid congressional acts. The primary distinction between the case at bar and some of the cases previously adjudicated and noted by appellant is important at this point. Attention, therefore, is again called, at the expense of repeating, to the fact that there is a difference between severability of application and severability of subject-matter. Reference is made to the previously mentioned difference between a prohibited application of an otherwise legal state statute to the field of Federal jurisdiction, and the enactment of a statute the subject-matter of which causes it to be unconstitutional and void. When a wrongful application alone is involved, as in the case at bar, it does not appear, upon good reason, why the statute, valid and constitutional when properly enforced, should be declared totally inoperative.

Whatever the rule may be, as adopted by the Federal courts in interpreting acts of Congress, we are constrained to hold that the same does not apply here. See *Supervisors v. Stanley* (105 U. S. 305), supra; and compare it with *Butts v. Merchants & Miners Transp. Co.* (230 U. S. 126), supra. The United States Supreme Court, in *Easton v. Iowa,* 188 U. S. 220, did not declare the entire legislation void, but rather, recognized the validity of the aforesaid statutes in so far as they are applicable to state institutions. A quotation from that opinion will suffice:

"Undoubtedly a state has the legitimate power to define and punish crimes by general laws, applicable to all persons within its jurisdiction. So, likewise, it may declare, by special laws, certain acts to be criminal offenses when committed by officers or agents of its own banks and institutions. But it is without lawful power to make such special laws *applicable* [the italics are ours] to banks organized and operating under the laws of the United States. It was by failing to observe the distinction between the two classes of cases that, we think, the courts below [state courts] fell into error. *The judgment of the Supreme Court of Iowa is reversed, and the cause is remanded to that court to take further action not inconsistent with the opinion of this court.*"

Accordingly the Supreme Court of Iowa did take further action, and thereby reversed the judgment of the district court, which had previously held that the defendant, Easton, conducting a national bank, was within the state's jurisdiction. That, and not the previous opinion of the Iowa Supreme Court, became the law of the *Easton* case. Since that time, numerous men have been convicted and sentenced under the statutes here considered. Furthermore, it is apparent that the Iowa legislature intended the act to be applied even though national banks were excluded. An extensive and complete program of bank legislation was inaugurated and adopted by the Iowa lawmakers. This covers the field not only of civil but criminal law as well. Those legislators, according to the legislation adopted, were primarily concerned with state banks and state bankers. Such was the principal object of the laws adopted. It is obvious that those legislators desired the act to stand even though it could not be extended into the field of national banks.

Therefore, regardless of *Easton v. Iowa* (188 U. S. 220), supra, the statutes under consideration are valid and enforcible within the realm of state jurisdiction. They are severable in application, and hence, applying the rules of construction previously discussed, the invalidity is removed by enforcing the law solely and alone against state banks and state bankers.

II. Conceding, for argument's sake, the correctness of the foregoing conclusion concerning the existence of severable statutes, the appellant, notwithstanding, insists, as previously

suggested, that Sections 9279 and 9280 of the Iowa Code are unconstitutional and void because in conflict with Section 1 of the Fourteenth Amendment to the United States Constitution, and Article 1, Section 9, of the Iowa Constitution. More specifically stated, appellant's claim is that those provisions of the Iowa statutes do not afford him due process of law. To put the thought in another way, appellant earnestly maintains that the words "insolvent" and "insolvency," as used in the foregoing legislation, are so indefinite and uncertain as to be no guide to conduct in the banking world. Wherefore it is claimed that these words are "incapable" of accurate definition and determination.

Because thereof, appellant declares that "no ascertainable standard of guilt or innocence is fixed."

In its instructions, the district court defined "insolvent" as follows:

"* * * A bank is solvent, within the meaning of the statute upon which the indictment in this case is based, when it possesses assets of sufficient value to pay within a reasonable time, in the ordinary course of business, all of its liabilities through its own agencies; and it is insolvent when it does not possess assets of such value."

Whether any other definition of "insolvent" or "insolvency," as used in the statute, would make the legislation void or unconstitutional, we do not now suggest or decide. Our investigation of the subject will be confined to the definition used by the district court, because that is the only one which in any way affects the appellant.

Basis for the district court's instruction aforesaid may be found in opinions of this court. *State v. Cadwell,* 79 Iowa 432; *State v. Childers,* 202 Iowa 1377; *Runge v. Benton,* 205 Iowa 845. After the decision in *State v. Cadwell* (79 Iowa 432), supra, the Iowa legislature re-enacted this Fraudulent Banking Statute, in practically the same language, and codified the same in the Code of 1897. When so doing, the legislature impliedly recognized (the *Cadwell* case was decided before the 1897 Code) that the word "insolvent," as used in the statute aforesaid, had been interpreted by this court as indicated in the *Cadwell* case. Approval of such definition by the legislature is apparent because the language of the statute was not changed in any substantial or material way. *New York Life Ins. Co. v. Burbank,* 209 Iowa 199; *Martin v. City of Oskaloosa,* 126 Iowa 680; *State ex rel. Pearson v. McEntee,* 68 Iowa 381 (local citation 383). See *In re Estate of Dolmage,* 203 Iowa 231 (local citation 235); *Moore-Mansfield Constr. Co. v. Indianapolis N. C. & T. R. Co.,* 179 Ind. 356 (101 N. E. 296, 308); *State v. Derry,* 171 Ind. 18 (85 N. E. 765, 768); *In re Estate of Moffitt,* 153 Cal. 359 (95 Pac. 653, 654); *Kepner v. United States,* 195 U. S. 100; *State v. Hamey,* 168 Mo. 167 (67 S. W. 620, 628); 15 Corpus Juris 945, Section 340; 36 Cyc. 1143, 1144; 25 Ruling Case Law 1075, Section 297.

Since the re-enactment of the original legislation into the Code of 1897, as aforesaid, the definition of "insolvent" used in *State v. Cadwell* (79 Iowa 432), supra, has been followed, as shown by *State v. Childers* (202 Iowa 1377), supra, and *Runge v. Benton* (205 Iowa 845), supra. Hence it is manifest that the definition given the jury by the trial court in the case at bar is the one approved, not only by this court, but by the state legislature, as well. Additional to the requirement concerning "insolvency," the statutes under consideration demand not alone that the bank be "insolvent," but that the defendant, when he receives the deposit, have knowledge of such financial condition. *State v. Dunning,* 130 Iowa 678, local citation 681; *State v. Gregory,* 198 Iowa 316, local citation 321; *State v. Childers* (202 Iowa 1377), supra. While discussing the subject in the *Childers* case, the following language is used, on page 1380:

"We have repeatedly held, under the foregoing section of the Code [9279 and 9280], that the burden is on the State to prove the insolvency of the bank, and also the defendant's knowledge thereof."

Nevertheless appellant says that the definition used by the court is too broad and uncertain to present a standard by which one can be guided in the banking field. So he urges that the Iowa statutes, as interpreted by the district court, failed to furnish due process of law, and therefore are unconstitutional. Reliance is made by the appellant upon the following, among other, Federal authorities: 12 Corpus Juris 1202, Section 971; *United States v. Brewer,* 139 U. S. 278; *United States v. Reese,* 92 U. S. 214; *United States v. Cohen Groc. Co.,* 255 U. S. 81; *Tedrow v. Lewis & Son Dry Goods Co.,* 255 U. S. 98; *Kennington v. Palmer,* 255 U. S. 100; *Kinnane v. Detroit Creamery Co.,* 255 U. S. 102; *Weed & Co. v. Lockwood,* 255 U. S. 104; *Willard Co. v. Palmer,* 255 U. S. 106; *Oglesby Groc. Co. v. United States,* 255 U. S. 108; *Weeds v. United States,* 255 U. S. 109. A study of the cited cases reveals a distinction between the legislation there considered and that now under review here. For the purpose of illustrating, the Lever Act was under consideration in the above cases cited in 255 U. S. Reports. In *United States v. Cohen Groc. Co.,* 255 U. S. 81, 89, the United States Supreme Court said:

"The sole remaining inquiry, therefore, is the certainty or uncertainty of the text in question,—that is, whether the words 'That it is hereby made unlawful for any person willfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries,' constituted a fixing by Congress of an ascertainable standard of guilt, and are adequate to inform persons accused of violation thereof of the nature and cause of the accusation against them. That they are not, we are of opinion, so clearly results from their mere statement as to render elaboration on the subject wholly unnecessary. Observe that the section forbids no specific or definite act. It confines the subject-matter of the investigation which it authorizes to no element essentially inhering in the transaction as to which it provides. It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee, and the result of which no one can foreshadow or adequately guard against.''

Manifestly, the legislation there under consideration, when applied to the subject-matter involved, is quite different from the Code sections here discussed, when associated with the conduct of a bank. The Lever Act entered into the field of conjecture, without guide or standard. It aimed at an ideal status in commerce. An operator in business under the Act would be required to note, not only his own business transactions, but also those of all others throughout the land, because these features would be material in determining unfair competition. Business men in their judgment would no doubt radically differ concerning the goal at which the congressional act aimed. In the case at bar, however, the regulation is practical and susceptible of understanding. Bankers know what is meant by "ordinary course of business," "liabilities," "agencies," and "assets." Likewise, the banker understands what is meant by "assets of sufficient value to pay within a reasonable time, in the ordinary course of business, all of [the bank's] liabilities through its own agencies." When operating under this state legislation, the banker is concerned with his own conduct, as distinguished from that of other bankers, operating different concerns. Consequently there is a standard and a guide.

Statutes of this kind have been very generally adopted by the legislatures of the various states, and, as thus enacted, have been widely enforced. Under statutes of this kind, something

may be left to the judgment of the banker. Possibly there is an element of estimation involved, when determining solvency or insolvency. This alone, however, will not defeat the statute. *Nash v. United States,* 229 U. S. 373; *Omaechevarria v. State of Idaho,* 246 U. S. 343; *Hygrade Provision Co. v. Sherman,* 266 U. S. 497. Within the discussion in *Nash v. United States* (229 U. S. 373), supra, the following declarations are made:

"And thereupon it is said that the crime thus defined by the statute contains in its definition an element of degree as to which estimates may differ, with the result that a man might find himself in prison because his honest judgment did not anticipate that of a jury of less competent men. The kindred proposition that 'the criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable. There must be some definiteness and certainty,' is cited from the late Mr. Justice Brewer, sitting in the Circuit Court. *Tozer v. United States,* 52 Fed. Rep. 917 * * *. But, apart from the common law as to restraint of trade thus taken up by the statute, the law is full of instances where a man's fate depends on his estimating rightly,—that is, as the jury subsequently estimates it,—some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. 'An act causing death may be murder, manslaughter, or misadventure, according to the degree of danger attending it,' by common experience in the circumstances known to the actor. 'The very meaning of the fiction of implied malice in such cases at common law was that a man might have to answer with his life for consequences which he neither intended nor foresaw.' * * * 'The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.' * * * If a man should kill another by driving an automobile furiously into a crowd, he might be convicted of murder, however little he expected the result. * * * If he did no more than drive negligently through a street, he might get off with manslaughter or less."

Thus it is seen that much is left to the understanding of men concerning what is meant by the words used in a criminal statute. Before us, as previously stated, is a statute dealing

with a subject well understood in the world of bankers. They know the terms and requirements set forth in the definition formulated by the district court and submitted to the jury. Protection is afforded the appellant, because not only must "insolvency" exist, as thus defined, but he must have actual knowledge thereof. If he does not have said knowledge, he is not guilty, and there can be no conviction. While judgment may be required, to determine whether a bank is solvent or insolvent, under the definition, yet there can be no doubt about the appellant's security, because he is not liable to punishment unless he actually knows that there is insolvency. Doubt, disputes, and uncertainty about insolvency, therefore, become immaterial under this particular phase of the controversy, because the appellant is not responsible unless he actually knows there is insolvency, regardless of the doubts, uncertainties, and disputes. *State v. Dunning* (130 Iowa 678), supra; *State v. Gregory* (198 Iowa 316), supra; *State v. Childers* (202 Iowa 1377), supra.

Therefore, under the record here presented, the statute is not unconstitutional for the reasons asserted.

III. A reversal of the judgment below is also asked, as previously suggested, because the court erred in admitting evidence, giving instructions, and ruling on objections to the State's argument. Consideration will now be given to those general propositions in the order named.

It is said that the trial court erred in admitting, over appropriate objections, certain evidence concerning appellant's declarations and acts after accepting the so-called illegal deposit. Generally speaking, the subject-matter of this complaint may be divided into three propositions. These three phases of the controversy will be considered in the following numerical order:

First: Apparently there was a meeting of the bank's board of directors on April 7, 1927, for the purpose of deciding whether the bank should be closed. Mr. L. E. Bopp was at the meeting, and, when he became a witness, the court permitted him to say that the appellant stated: "It [the bank] is hopeless. * * * The bank ought to have been closed five years ago." Appellant urges that nothing thereby indicates when he learned the bank became "hopeless and should have been closed five years ago." He says the

foregoing recitation made no indication whatever that the appellant had such knowledge on April 5th previous. To put the thought in another way, appellant maintains that, under the foregoing testimony, he may have received the information given the witness Bopp after the fifth, the day the deposit was received. We do not now decide that the evidence would have been admissible, had it not indicated that the appellant possessed such knowledge on April 5, 1927. There is not now before us the distinct question relating to whether the evidence would have been admissible, had it not signified that the appellant possessed such knowledge on April 5, 1927. What our conclusion would be, were such definite question now presented, we do not decide; but, on the general subject that presumptions do not ordinarily relate backwards, see *Corbin v. McAllister*, 144 Iowa 71 (local citation 80) ; *State v. Liechti*, 209 Iowa 1119. However that may be, there were, in fact, other parts to said conversation related by the witness (not quoted) which tend to suggest that the appellant had knowledge of the bank's insolvency on the preceding April 5th, when the deposit in question was received. Manifestly, then, there is more confronting us than the single proposition indicated by appellant. This added element in the portion of the evidence not quoted so connected the quoted portion thereof that the whole furnished a foundation upon which the jury could base a finding, if it so elected, to the effect that appellant had such knowledge on the preceding April 5th. So the jury properly could conclude, as they apparently did, that the appellant conveyed the thought that he had the information on April 5th, as well as on the 7th. Consequently, the evidence was rightfully admitted. Whether, in any event, the jury should have been given more definite instructions concerning a more limited application of such testimony, we do not now determine, because no exception in this regard was taken to any charge made by the trial court to that fact-finding body. *State v. Bingaman*, 210 Iowa 160; *State v. Bamsey*, 208 Iowa 796; *Anthony v. O'Brien*, 188 Iowa 802; *State v. Burch*, 202 Iowa 348; *State v. Vandewater*, 203 Iowa 94.

Second: Evidence was offered by the State to show that the appellant, on said April 7th, obtained possession of certificates of deposit owned by his wife and daughter, returned them

 to the bank, and removed, in exchange therefor, certain promissory notes. These certificates were not due. Wherefore, the State argues that it became material and relevant to disclose appellant's conduct in the premises.

Again, it is insisted by appellant that the foregoing testimony should not have been admitted into the record because it only tended to show his knowledge of the bank's affairs on April 7th, but in no way signified such knowledge on the preceding 5th. Assuming, without deciding, that appellant is right in this contention, yet that does not mean that the evidence was not admissible for some other purpose. For instance, this testimony revealed a circumstance indicating, to some extent at least, that the bank was insolvent on the 7th, and therefore was about to be closed. That testimony, if properly connected with supporting proof, might denote the bank's insolvency on the preceding April 5th, when the deposit was received. *State v. Cadwell,* 79 Iowa 432, 438, declares:

"* * * that fact [the fact of insolvency at a subsequent date] might be an aid in determining the true condition of the bank * * * [on a previous date] by showing what changes had taken place in the property affairs of the firm in the meantime."

Manifestly, therefore, it is proper to show the insolvency of a bank on a subsequent date, providing other evidence is introduced connecting the record in such a way as to indicate that the institution had not changed in its financial condition between such subsequent date and the previous date in question. In such event, if there is proper connecting evidence, the financial condition on the subsequent date becomes material to show its status on a previous day. Thus it was material in the case at bar to prove the condition of the bank on the 7th, provided that the history of the institution was properly revealed, so as to disclose no material changes between the 7th and the 5th. Within the record in the present controversy there is evidence from which the jury could well find that there was no material change in the bank's financial condition between the subsequent and the previous dates. Resultantly, the evidence was admissible to show the bank's insolvency, although the same was or was not proper to prove the appellant's knowledge thereof. Ob-

viously, however, evidence which is admissible for one purpose may be allowed in the record although the same might be inadmissible for another object. *Stotts v. Fairfield,* 163 Iowa 726 (local citation 738) ; *State v. Donavan,* 125 Iowa 239; *State v. Detloff,* 201 Iowa 159 (local citation 168) ; *State v. Harris,* 153 Iowa 592 (local citation 594).

No complaint is made because the trial court did not properly confine the use of this testimony to its legitimate purposes. Under the circumstances, then, the appellant has no ground for complaint.

Third: Testimony was received into the record tending to prove that a certain depositor had a considerable sum of money in the bank on said April 7th, and that appellant induced him to purchase appellant's house therewith. During the negotiations, the appellant told this particular depositor that the bank would be closed on that day. Therefore, the purchase was made, a check given to the appellant for the purchase price, and the latter cashed the same.

Here the State's object was similar to that in showing the transaction concerning the certificate belonging to appellant's wife and daughter. Criticism of the trial court's ruling in admitting the evidence is made by the appellant on the theory that the incident did not prove he had knowledge of the bank's insolvency on the preceding April 5th. Conceding, without deciding, in this case, as in the previous one, that the appellant is right about this, yet that does not mean that the evidence was not admissible for some purpose. It is not necessary to repeat the previous discussion, but by this reference the same is incorporated here.

Because the evidence was admissible for the object above indicated, and no complaint is made that the jury were not admonished to strictly or properly apply the same, there is no reversible error, under the circumstances.

IV. Complaint also is made by the appellant because the district court permitted evidence of deposits made in the bank after April 5th, the time when the illegal act is claimed to have

 been committed. Appellant's theory here is that future deposits became immaterial, and could only, under the circumstances, amount to evidence of additional crimes. Wherefore, prejudice, he says, arose.

Some of this evidence was received in the record without objection. The written record of the bank's deposits was offered and received. This record revealed the subsequent deposits aforesaid, as well as previous deposits. A general objection was made by the appellant that the same was immaterial, irrelevant, and incompetent. Without deciding that such general objection was sufficient to raise the point now relied upon, we assume its sufficiency in that regard. Yet no ground for reversal appears, because it was proper for the State to show the deposits made at least up to the time in question. Thereby the State furnished some evidence of the bank's liabilities. Materiality, therefore, of the previous deposits clearly appears.

As before said, the written deposit records contained previous as well as subsequent deposits. All objections, however, made by the appellant, as before said, were general, and there-fore they did not separate the admissible from the alleged inadmissible portions of the bank's deposit records: If part of the record was material, it was not error for the district court to admit the whole thereof, over a general objection of the nature indicated. Concerning this subject, we said, in *State v. Crofford*, 133 Iowa 478 (local citation 488):

"That some of the matters [in letters] included were irrelevant was not ground for excluding the letters in their entirety, and it was not for the court, in the absence of specific objection, to separate the portions which had some bearing on the case from others having no possible connection therewith. Had counsel desired parts excluded, he should have pointed them out, and made appropriate objections thereto, instead of contenting himself with general objections to each letter as a whole."

On the same proposition see *State v. Hasty*, 121 Iowa 507 (local citation 518); *State v. Brady*, 100 Iowa 191 (local citation 199). Nor after the record was thus made did the defendant move to strike out the immaterial and irrelevant portions

thereof, but rather, he permitted the whole to remain. But appellant insists that oral testimony was likewise given, covering the same subject-matter. What has been said concerning the documentary evidence applies very largely to the oral testimony. Moreover, with the documentary evidence in the record, the additional oral testimony became cumulative. However that may be, the subsequent deposits were material, when taken together with other evidence, to show the status of the bank's solvency or insolvency. Assuming, as before indicated, that it was proper to show subsequent insolvency for the purpose of connecting that situation with the standing of the bank on a previous date, then these subsequent deposits were material in the process of tracing the sameness or difference in the bank's financial condition on the two dates aforesaid.

For the reasons indicated, therefore, appellant is not entitled to a reversal because the district court admitted the foregoing evidence.

V. Continuing his objections, the appellant complains because the district court allowed certain witnesses to testify regarding the value of the bank's assets. These witnesses, gen-erally speaking, were experienced business men, who had handled loans, were familiar with commercial paper, and knew the value of farm lands. Munson, of the witnesses aforesaid, had previously engaged in the loan and banking business. Each witness testified that he knew the market value of the land and other property at the time in question. Especially, however, complaint is made by appellant because the witnesses Munson and Blomgren were permitted to testify concerning the value of real estate located in North Dakota, South Dakota, and Canada. It is appellant's contention that these witnesses were residents of Iowa, and not familiar with land values in either North or South Dakota, or in Canada. Furthermore, appellant maintains that these witnesses did not inspect the land, and relied wholly upon what other people told them concerning the value. Blomgren and Munson both saw the Dakota and Canadian lands, although they may not have made close inspections of them. They investigated the tax assessment thereof. Both said that they knew what the fair market value of the land was in April, 1927. Those witnesses, it is true, made

inquiries regarding the value of said lands from loan agents, farmers, and real estate men in the vicinity where the realty was located. On cross-examination, their evidence was somewhat shaken. Notwithstanding that, the weight thereof was for the jury. *Monson v. Chicago, R. I. & P. R. Co.,* 181 Iowa 1354 (local citation 1365) ; *Wicks v. German L. & Inv. Co.,* 150 Iowa 112 (local citation 116) ; *Frick v. Kabaker,* 116 Iowa 494 (local citation 506) ; *Robbins v. Selby,* 144 Iowa 407 (local citation 412) ; *Wiley v. Dean Land Co.,* 171 Iowa 75 (local citation 77) ; *Lawrence v. City of Sioux City,* 172 Iowa 320 (local citation 325). Upon the point now under discussion, we said, in *Lawrence v. City of Sioux City* :

"As observed in *Wiley v. Dean Land Co.,* 171 Iowa 75, that much of her [the witness's] information was derived from others is not objectionable; for, necessarily, knowledge of values is largely so acquired, and the hearsay rule is without application."

*Vanarsdol v. Farlow,* 200 Iowa 495, relied upon by appellant, is not in point, because there the witness did not know the value at the time material. Here, the witnesses testified concerning the value of the Dakota and Canadian lands in April, 1927.

Manifestly, the evidence was admissible. Its weight, of course, was for the jury. Hence, the court did not err in receiving the testimony into the record.

VI. Objection is made by the appellant because the district court, in Instruction 8, referred to the offense as "fraudulent banking." This, appellant says, was error. Although the offense was thus designated in that particular  instruction, yet the definition of fraudulent banking, following such designation, was that set forth in Sections 9279 and 9280, supra. To put the thought in another way, the district court said in its instructions that the defendant was indicted for the crime of "fraudulent banking," which, under the court's own definition given therein, meant that the appellant accepted the deposit while the bank was insolvent and he knew of such insolvency. In order to make this plain, the district court quoted the substance of the foregoing statutes. Appellant, therefore, could not in any way have been prejudiced, for the defini-

tion of the offense contained in the instructions was equivalent to the charge set forth in the indictment.

Even a misnamed offense in an indictment is not fatal if the proper facts charging the same are duly alleged therein. *State v. Wyatt*, 76 Iowa 328; *State v. Davis*, 41 Iowa 311. Many times this court has referred to this particular offense as "fraudulent banking," and it is so known generally in the state. See preliminary statement in *State v. Gregory*, 198 Iowa 316; *State v. Ostby*, 203 Iowa 333; *State v. Carter*, 182 Iowa 905; *State v. Cadwell* (79 Iowa 432), supra.

There was no ambiguity in the aforesaid instruction, nor was there a variance between it and the indictment. Under the circumstances here disclosed, the jury must have understood fully the crime with which the appellant was charged. Wherefore, there is no reason for reversal.

VII. Exception is also taken to the district court's Instruction No. 20, concerning expert witnesses. More specifically, appellant's objection is that the last sentence of the instruction  authorizes "the jury to substitute their own judgment and knowledge [for that of] the witnesses, thus, in effect, making the jurors silent witnesses."

It is to be remembered that the expert witnesses under consideration testified concerning the value of real and personal property. What the court actually told the jurors in said instruction was, in substance, that they were to use their own judgment in considering the evidence and fixing the value, and that such judgment need not be surrendered for that of the expert witnesses. Obviously the trial court did not tell the jury to ignore the testimony of any witness.

For condemnation of the instruction, reliance is made by appellant upon cases from Kentucky, Michigan, and Georgia. What the rule may be in those jurisdictions we do not now decide, for in Iowa the instruction has the approval of this court. *Moore v. Chicago, R. I. & P. R. Co.*, 151 Iowa 353; *Fowle v. Parsons*, 160 Iowa 454; *In re Estate of Stryker*, 191 Iowa 64; *Helm v. Anchor Fire Ins. Co.*, 132 Iowa 177 (local citation 183); *Hoyt v. Chicago, M. & St. P. R. Co.*, 117 Iowa 296 (local citation 301); *Converse v. Morse*, 149 Iowa 454 (local citation 456). The

identical instruction was approved in *Hoyt v. Chicago, M. & St. P. R. Co.* (117 Iowa 296), supra (local citation 301).

VIII. Grievance, too, is predicated by appellant upon the thought that the trial court, in its instructions, emphasized the State's evidence and minimized that of the appellant. A careful reading of the instructions, however, reveals that there is no merit in appellant's complaint. No special attention is directed to any item of testimony. Statements of what the law required the State to prove were first set forth, and then the court discussed the facts in a general way advocated by both the State and the appellant. Prominence was given to one set of facts as much as to the other. That situation does not demand a reversal.

IX. Contention is also made by the appellant that one of the State's attorneys was guilty of misconduct in argument. Appellant charges that said attorney, during his closing argument, declared ''that the bank examiner, Beatty, testified that over $100,000 worth of the [bank's] paper was ordered charged off two years before, and that the same was still in the bank at the time it closed.''

An examination of the record discloses that the State's attorney did not make the statement above set forth. Rather, this attorney told the jury that ''$100,000 of the [bank's commercial] paper was discussed [between officials of the state banking department and officers of the bank, in March, 1926], which [paper] was still in the bank when it closed.'' Thereby it is apparent that the State's attorney did not make the unfounded declaration claimed by appellant. As actually made, the statement of the State's attorney was true. Prejudice in no way appears.

We have carefully read the entire record, and are constrained to conclude that there was ample evidence upon which the jury could find that the bank was insolvent when the deposit was received by the appellant, and that he then and there knew of such insolvency. He had a fair trial, and therefore the judgment of the district court should be, and hereby is, affirmed.— *Affirmed.*

All the justices concur.