**CHARLESWORTH v. LEVY MEAT CO.
et al.**

No. 9999.

Circuit Court of Appeals, Eighth Circuit.
Nov. 26, 1934.

Rehearing Denied Jan. 5, 1935.

Harry L. Jacobs, of Kansas City, Mo.
(I. J. Ringolsky and William G. Boatright,
both of Kansas City, Mo., on the brief), for
appellant.

Claude A. Ferguson and Cyrus Crane,
both of Kansas City, Mo. (Lathrop, Crane,
Reynolds, Sawyer & Mersereau, of Kansas
City, Mo., on the brief), for appellees.

Before GARDNER, SANBORN, and
WOODROUGH, Circuit Judges.

WOODROUGH, Circuit Judge.

This appeal is taken by J. F. Charles-
worth, trustee in bankruptcy of the estate of
Levy Brothers Meat & Provision Company,
bankrupt, from a decree refusing to grant
relief against alleged fraudulent transfers
and preferences given by the bankrupt to
Levy Meat Company and Leon Levy.

The Issues and Findings.

The allegations of the amended petition
in equity filed by the trustee against Levy
Meat Company and Leon Levy are as fol-
lows:

"Count One.

"Complainant for his first cause of ac-
tion against defendants states:

"(1) That Levy Bros. Meat & Provision
Company was adjudicated a bankrupt on or
about July 17, 1930 in this court and com-
plainant was duly elected and qualified as
trustee and is now acting as such.

"(2) That the Levy Meat Company is a
corporation organized under the laws of Mis-
souri and all its stock is owned by defend-
ant Leon Levy who furnished all the cash

representing the capital stock of said company and he is president of same and, with two dummy directors, constituted at all times mentioned herein, the Board of Directors.

"(3) That jurisdiction of this cause is based on Sections 23-b, 60-b, 67-e and 70-e of the National Bankruptcy Act of 1898 and amendments thereto.

"(4) That at all times mentioned in this petition and for many years prior thereto Levy Bros. Meat & Provision Company was engaged in Kansas City, Missouri, in the wholesale and retail meat and provision business formerly doing business exclusively in stalls in the Market House in Kansas City, Missouri, and since about 1926 in said stalls and also in a building located at the corner of 31st Street and Gillham Road in Kansas City, Missouri.

"That defendant Leon Levy, with his brothers, Forrest Levy and Harry Levy, and his brother-in-law, Morris Finkelstein, were, up to 1923, the stockholders, directors and officers of the bankrupt company, each having in his own name one-fourth of the capital stock thereof; that in 1923 Leon Levy sold his stock in said bankrupt company to his brothers and brother-in-law heretofore mentioned and thereafter retired from active business, but continued to be present continually in the office of the bankrupt, worked for the bankrupt, and advised and consulted continuously with his brothers in the operation of the bankrupt's business; that said Leon Levy gave security and made guaranties to packing houses in behalf of the bankrupt and made loans of money to the bankrupt all done without charge or compensation and for the purpose of enabling the bankrupt to obtain credit and operate its business; that from December 1, 1929, until June 1, 1930, the defendant, Leon Levy, was employed by the bankrupt at a salary of $75.00 per week in many and various capacities, his duties including among others obtaining contracts, making sales, lobbying for public contracts, collecting, and divers other duties.

"That for many years prior to and continuing up to June 1, 1930, defendant Leon Levy and his said brothers and brother-in-law owned a home at No. 3615 Genesee Street in Kansas City, Missouri, occupied by said Leon Levy, his said brothers and brother-in-law and the wife of said brother-in-law; that all of the funds and provisions used in the maintenance and sustenance of said home were at all times taken and withdrawn from the assets of the bankrupt. Leon, Harry and Forrest Levy and Morris Finkelstein and his wife, a sister of the Levy brothers, all lived as one family, in said home at No. 3615 Genesee Street.

"(5) Complainant states that prior to July 1, 1929, the bankrupt was the lessee in a lease of five stalls in the City Market of Kansas City, Missouri, said lease being made by the city of Kansas City as lessor. Said lease being of the value of not less than $10,000.00; for years prior to and up to July 1, 1929 the bankrupt continued the business of operating a meat market in said stalls; that on July 1, 1929 the lease of said stalls held always in the name of bankrupt expired according to its terms; that thereupon, without any consideration for a change in the lessee, a new lease was caused to be executed by the City of Kansas City, Missouri, said new lease being taken in the name of Leon Levy as lessee, said lease running, according to its terms, until April 30, 1930.

"(6) That on April 30, 1930 Kansas City, Missouri, the owner of said stalls, ceased executing written leases for stalls in its Market House, but continued to orally license and allow markets to be conducted in same, in accordance with an understanding that said former lessees and occupants would be allowed to occupy said stalls and continue to use same in the same manner as had been formerly done under the written leases, so long as said businesses paid their rents and adhered to the reasonable rules and regulations of Kansas City, Missouri, governing same.

"(7) That while said lease was in the name of Leon Levy and between the months of October, 1929 and January, 1930, the bankrupt expended in tearing out old fixtures and equipment and in installing new machinery, furniture and equipment in said stalls, the sum of $5,485.00 and, in addition, furnished men employed by it regularly, in its place of business at 31st and Gillham Road, to perform all labor required in so removing and installing said equipment, making a total additional new investment in said stalls of approximately $6,000.00; that, from and after the time the lease to said stalls was put and carried in the name of Leon Levy, as lessee, and up to May 15, 1930, the bankrupt continued to occupy same and to operate its business therein and to manage and control said business and said stalls just as it had previously done, while the lease was in its own name, said Leon Levy continuing to have no interest in said stalls and the business conducted therein.

"(8) That on or about May 15, 1930 and within four months prior to the filing of the petition in bankruptcy against the bankrupt, the bankrupt pretended to sell said stalls and all equipment, machinery, furniture and the stock of merchandise then on hand in said stalls, all as a going concern, to defendant Leon Levy for a pretended consideration of $1,500.00; that said sum was less than one-tenth of the then actual real cash value of the assets so pretended to be sold; that about the same time said defendant Leon Levy pretended to sell and transfer same to defendant Levy Meat Company for the same price; that since the date of said pretended sales and transfers the title to said license and rights of occupancy and property have been kept and continued in the name of Levy Meat Company; that said pretended sales and transfers were made by bankrupt to defendant Leon Levy and Levy Meat Company for the purpose of hindering, delaying and defrauding the bankrupt's creditors and while bankrupt was insolvent and so known to be by the defendants, and for the purpose of aiding and assisting the bankrupt to carry out its said purpose and intent and that said pretended sales and transfers were made for the use and benefit of the bankrupt and its officers; that said pretended sales and transfers were knowingly made for a grossly inadequate consideration and are void as against complainant under the Bankruptcy Act of 1898 and amendments thereto and under the laws of the State of Missouri.

"(9) That said pretended sales and transfers were made pursuant to, in furtherance of and to effect the object of a conspiracy previously formed on or about July 1st, 1929 and then existing between the defendants and the bankrupt and its officers, said conspiracy and the objects thereof being as follows, to-wit:

"Said defendants and said bankrupt and its officers did, in anticipation of the bankruptcy of said bankrupt, conspire, combine, confederate and agree together to directly and indirectly transfer to defendants the greater part of all of the assets of the bankrupt, including its merchandise, cash, furniture, fixtures, trucks, accounts receivable, list of available and financially good customers, and its good will, well knowing the said bankrupt to be insolvent and with the intent and purpose of concealing said property and assets from the creditors of the bankrupt and from whomsoever should be entitled to its assets under the Bankruptcy Act of 1898 and amendments thereto and specifically from the trustee in bankruptcy who would thereafter be elected or appointed for said bankrupt.

"(10) That pursuant to said conspiracy and in order to effect the objects thereof, defendant Leon Levy, on or about May 5, 1930, with the knowledge and consent of bankrupt, caused to be incorporated under the laws of Missouri, his co-defendant, the said Levy Meat Company; that it was agreed between the defendants, the bankrupt and its officers that Levy Meat Company should install itself in a location in Kansas City, Missouri, and there engage in the wholesale meat and provision business and should receive and take over and be the transferee of all of the assets of the bankrupt that could be used in the business thus engaged in and should, in like manner, also take the best customers, custom, trade and good will of the bankrupt and should engage in the same business as the bankrupt, all in anticipation of bankruptcy of said bankrupt, and that the defendants should conduct said business, until defendants and bankrupt should conclude it advisable to have the bankrupt adjudicated a bankrupt and thereafter.

"(11) That said Levy Meat Company did, pursuant to said agreement and conspiracy, install itself in the five stalls in the city market in Kansas City, Missouri, and later in the Empire Storage Building and did engage, as agreed, in the wholesale meat and provision business and did take over and have transferred to it, as hereinbefore mentioned, a large part of the assets of the bankrupt and did use same in its business and did take over the best customers, custom, trade and good will of the bankrupt and did engage in competition with and in the same business as the bankrupt, all in anticipation of the bankruptcy of the bankrupt, and that defendants did conduct said business until the bankrupt was adjudicated a bankrupt and for sometime thereafter, all of same being done by the defendants within four months prior to the filing of the petition in bankruptcy herein and at a time when the bankrupt was insolvent and known to be so by the defendants; that all of this was done to hinder, delay and defraud the present creditors of the bankrupt, most of whom had claims against the bankrupt prior to May 1, 1930; that all of said accounts, transfers, taking over and engaging in business was in trust and for the use and benefit of the bankrupt, its stockholders, directors and officers; that in no instance mentioned in this petition were the defendants bona fide purchasers in good faith and for value of any of the assets received from the bankrupt.

956

"(12) That in order to carry out the purpose of said conspiracy and to effect the objects thereof, the bankrupt, its officers and employees, aided the defendant in finding a location for that portion of the business of Levy Meat Company devoted to the wholesaling of meat and provisions, and it was agreed between the bankrupt, its officers and employees, and the defendants that said business to be conducted in the name of Levy Meat Company should be and it was located in a building occupied by the Empire Storage Company in Kansas City, Missouri; that a lease was caused to be taken in the name of defendant Levy Meat Company, as lessee, for space in said building, for a period of five years, at a rental of $175.00 per month; that equipment and furnishings were obtained from bankrupt at less than market value of same and installed in said space, such equipment and furnishings being superintended and installed by the bankrupt through its officers and employees, practically all at the cost and expense of the bankrupt.

"(13) That in furtherance of said conspiracy and to effect the objects thereof, the bankrupt, from and after May 15, 1930, and up to July 17, 1930, when the Receiver in Bankruptcy was appointed, pretended to sell meats, provisions and merchandise to the defendants and delivered same to the defendants and received the pretended purchase price thereof, said pretended purchase price being less than market value and less than could have been received in the ordinary course of business for said merchandise by the bankrupt, said pretended sales being made by the bankrupt and the defendants in bad faith and by falsely and fraudulently belittling the actual value, quantity, quality and condition of said merchandise; that said pretended sales were supposed to be made for cash; that the Levy Meat Company pretended to pay approximately $12,000.00 in cash for said meats and provisions; that the actual value of the merchandise thus pretended to be sold and which was actually delivered by the bankrupt to the defendants greatly exceeded said sum and, on information and belief, complainant alleges the fact to be that the value of said merchandise was more than $25,000.00 and was so known to be by the defendants and the bankrupt.

"(14) That pursuant to said conspiracy and in order to effect the objects thereof and during the times mentioned herein, and while bankrupt was engaged in business at 31st and Gillham, and the defendants were engaged in business in the Market House and in the Empire Storage Building, the bankrupt, through its officers, gratuitously ordered all merchandise received by the defendants from packing houses in Kansas City, Missouri, said orders being placed almost daily; that the purchase prices for merchandise so ordered were charged to the bankrupt but that none of said merchandise so ordered, was delivered to bankrupt; that in many instances merchandise so ordered, instead of being delivered to the defendants, was delivered to the bankrupt, packed by it and delivered by it to customers supposed to have placed orders for same with defendants; that all of the merchandise so ordered by the bankrupt was paid for by the bankrupt, all of which was done without receiving any consideration from defendants; that the exact amount of said purchases and sums due complainant on account of such purchases, filling of orders of the defendants and payment of said purchases of merchandise delivered to the defendants, is unknown to the complainant, but that same amounts to a considerable sum.

"(15) That in furtherance of said conspiracy and in order to effect the object thereof, the bankrupt pretended to sell and the defendants pretended to purchase from it a vast amount of tools, trucks, equipment, machinery and furniture, some of which were delivered to the defendants at said stalls and most of it was delivered to defendants in said wholesale place of business in the Empire Storage Building; that the pretended price and consideration for such pretended purchase was less than $650.00; that such a price was grossly inadequate for said property, same being of the fair and reasonable value of not less than $5,000.00.

"(16) That in furtherance of said conspiracy and in order to effect the objects thereof, on and after May 15, 1930, and up to the appointment of a receiver for the bankrupt's assets, the bankrupt transferred and turned over to the defendants all its financially good customers, custom and trade and its entire good will and filled orders for the defendants and shipped orders in the name of defendant, Levy Meat Company, and advised and requested its customers to purchase meat and provisions from defendants, and gradually decreased its own assets and business, until, by the time the receiver was appointed for the bankrupt, it had no good will or business, but same had been successfully and completely turned over to and acquired by the defendants.

"(17) That in furtherance of said conspiracy and in order to effect the objects thereof and before the appointment of a receiver to take possession of bankrupt's assets, the defendants, with the consent and approval of the bankrupt, made their headquarters in bankrupt's offices, had its records kept by an employee of bankrupt and deposited its daily receipts from operating the market stalls in bankrupt's bank account and in bankrupt's name and also hired some of the most experienced and best employees of the bankrupt to work for said defendants and, shortly after the appointment of said receiver, the said Forrest Levy, Harry Levy and Morris Finkelstein, being the owners of all the stock of the bankrupt, its officers and directors, and many employees of the bankrupt's organization, were taken by the defendants from the bankrupt's place of business to the defendants' places of business and there occupied the same relative positions and employments with the defendants that they had occupied when working for bankrupt.

"(18) Complainant further states that the present creditors of the bankrupt who have filed and had claims allowed against the estate of the bankrupt to the extent of not less than ninety per cent were creditors of the bankrupt at the time the conspiracy mentioned herein was formed and at the time all the acts and transactions mentioned herein took place.

"(19) Complainant further states that all the assets in his possession are insufficient to pay the debts of the bankrupt and that the same will not pay to exceed 30% of the liabilities of the bankrupt and that said liabilities amount to the sum of $62,780.89.

"Wherefore, complainant asks for an order and judgment declaring the lease made to Leon Levy on July 1, 1929 by the City of Kansas City void, and declaring the defendants, as holders of said lease, trustees for the bankrupt and the complainant; also that an order be made declaring the license held by the defendants to the five stalls located in the City Market House in Kansas City, Missouri, void and declaring the defendants holding said license as trustees for the bankrupt and complainant; and that the defendants be ordered to deliver and turn over the possession of said stalls and the keys to the same and the license held by them for said stalls to the complainant; that the defendants be ordered to account for all profits and rentals realized from the use and occupancy of said stalls under the lease mentioned herein and under the license held by them; that the court also make an order declaring all transfers of merchandise and other personal property, together with the list of customers and good will of the bankrupt, transferred by the bankrupt to the defendants, null and void, and to declare the defendants trustees for the bankrupt and complainant in the holding of said property, list of customers and good will of the bankrupt and also make an order compelling the defendants to account to the complainant for the value of said merchandise and other personal property and list of customers and good will of the bankrupt transferred by the bankrupt to the defendants and account also for all the profits made by the defendants out of the property, list of customers and good will transferred to them by the bankrupt, and that an order be made that the defendants be enjoined and restrained from using the list of customers and the good will of the bankrupt assigned and transferred by the bankrupt to the defendants.

"That on a final accounting complainant have a judgment against the defendants for the amount found due the complainant and for interest on same and for costs herein and for such other and further relief as the plaintiff may be found entitled to in equity and good conscience.

## "Count II.

"(1) Complainant adopts and makes a part of this count, the same as if specifically repeated and set out herein, all of Count I except the prayer thereof.

"(2) Complainant further states that the defendant Leon Levy, by written guaranty, made in the year 1928 to the Armour Packing Company of Kansas City, Missouri, guaranteed to pay all indebtedness contracted by the bankrupt with said Armour Packing Company for merchandise sold by said packing company to the bankrupt on credit, up to the sum of $10,000 and, on the same date, made a similar guaranty to Fowler Packing Company, of Kansas City, Missouri, a subsidiary of Armour Packing Company, wholly owned, managed and operated by it, guaranteeing to pay all indebtedness of the bankrupt to said company for merchandise sold to the bankrupt on credit, in the sum of $2,500.00; that credit had been refused by said packing companies to the bankrupt unless they received guaranties from the defendant Leon Levy agreeing to pay the

amounts due them from the bankrupt, if bankrupt failed to pay the same.

"(3) That on or about May 21, 1930, within four months prior to the filing of the involuntary petition in bankruptcy against the bankrupt and at a time when the bankrupt was insolvent and known to be insolvent by the defendants, the defendants caused the bankrupt to pay its indebtedness to said Armour Packing Company amounting to approximately $7,500.00 and to Fowler Packing Company its indebtedness to said company in the sum of approximately $2,500.00, so as to relieve said Leon Levy of all liability on the said guaranties signed by him.

"(4) Said payments were made to give said Leon Levy, as a creditor and guarantor of the bankrupt's accounts to said Armour Packing Company and said Fowler Packing Company, a preference and to enable said packing companies and said Leon Levy to obtain a greater percentage of their debts and claims against the bankrupt than any other of such creditors of the same class; that said Leon Levy knew and had reasonable cause to believe that the payment of the claims of said packing companies by the bankrupt, through his assistance, would effect a preference as herein stated in favor of said packing companies and himself.

"(5) Said payments were made pursuant to the conspiracy hereinbefore referred to and to effect the object thereof and to enable the defendants to successfully take and acquire the assets of the bankrupt hereinbefore referred to and to utilize and employ same in the conduct of the new business operated in the name of the defendant Levy Meat Company, free of any liability of the said defendant Leon Levy on account of said guaranties and in the conduct of said business of defendants.

"(6) That as a part of the satisfaction of said guaranties and for the purpose of reducing the amount of the same, said guaranties of $7,500.00 and $2,500.00 mentioned herein were satisfied in full with the assistance of the defendants advancing to the bankrupt loans respectively of $2,000.00 made on May 21, 1930, and $2,204.07, as a part of this same transaction, made on May 19, 1930.

"On May 23, 1930, the defendant Leon Levy made two new guaranties, one to Armour Packing Company for the sum of $2,-500.00 and the other to Fowler Packing Company for $1,000.00, said guaranties being made in form the same as the two previous guaranties and given for the purpose of obtaining credit for the bankrupt from said companies in the amounts of each one of said guaranties. That, by reason of said guaranties, the bankrupt became indebted to said packing companies at the time the receiver was appointed in the sum of $3,250.00.

"(7) That within four months prior to the filing of the involuntary petition against the bankrupt and on or about June 14, 1930, while said bankrupt was insolvent and known to be so, the defendant Leon Levy caused the bankrupt to make to him its note for the sum of $5,500.00 payable on demand, said note for $5,500.00 evidencing the sum of $2,000.00 loaned by the defendant Leon Levy to the bankrupt for the purpose of satisfying the indebtedness of the bankrupt on May 21, 1930, to the Armour Packing Company and Fowler Packing Company and also evidencing the liability of Leon Levy on the two new guaranties made on May 23, 1930, to Armour Packing Company and Fowler Packing Company in the total sum of $3,-500.00; that on June 17, 1930, the bankrupt paid to the defendants said sum of $2,-204.07 borrowed from the defendants on May 19, 1930, for the purpose of satisfying the amount due Armour Packing Company and Fowler Packing Company on account of said guaranties.

"(8) That on June 19, 1930, the bankrupt assigned to Leon Levy as security for said demand note of $5,500.00, good accounts receivable of the face value of $8,600.00; that the sum of $5,500.00 was collected out of said accounts by July 12, 1930, but said note for $5,500.00 was never returned to bankrupt; that the balance of the accounts, up to $8,600.00, assigned by the bankrupt to the said Leon Levy has never been accounted for by the defendants to the bankrupt or to this complainant; that at the time of the making of said note of $5,500.00 the bankrupt was not indebted to Armour Packing Company or Fowler Packing Company in the sum of $3,500.00; that by the time the petition in bankruptcy was filed herein, on July 16, 1930, the bankrupt was indebted to said companies in the sum of about $3,250.00; that at the time said demand note of $5,500.-00 was made and executed on June 19, 1930, the defendants had not yet paid to Armour Packing Company or to Fowler Packing Company the amounts due from the bankrupt to them for merchandise purchased on a credit basis; that the amounts due from the bankrupt and from Leon Levy to the Armour and Fowler Packing Companies were

not paid by Leon Levy until after the petition in bankruptcy was filed herein and receiver appointed.

"(9) That the execution of said note and the assignment of the said accounts and payment of said $2,204.07 were made when the bankrupt was insolvent and known to be insolvent by the defendants and they were made for the sole purpose of protecting and holding said Leon Levy harmless from loss or liability on account of all the guaranties made herein and to enable him to receive a preference in the sum of $2,000.00 and $2,204.07 advanced by him to reduce and pay off the former guaranties made by him to said Armour and Fowler Packing Companies, so that his liability on guaranties would be reduced from $10,000.00 to $3,500.00 and to enable him to have a preference over other creditors of the bankrupt of the same class; that said loan of $2,000.00 and $2,204.07 mentioned herein were not made in good faith but were made to enable the bankrupt and its officers to conceal and convert the major portion of the assets of the bankrupt, and for the purpose of hindering, delaying and defrauding the creditors of the bankrupt, and payments in cash were made and said note and assignments of security made to said Leon Levy for the purpose of carrying out the objects and purposes of the conspiracy referred to in this petition and in Count I and made a part hereof.

"Wherefore, complainant prays that defendants be enjoined from transferring or assigning to anyone said note of $5,500.00 and that same be cancelled, and that he have and recover on an accounting all sums found to have been paid by the bankrupt to other creditors so as to relieve the defendant, Leon Levy, from liability on guaranties and an accounting of all sums realized from the accounts assigned to him as security for said $5,500.00 demand note mentioned herein and for the payment of said $2,204.07 and that an order be made on the defendants to assign and transfer to the complainant all accounts, if any, in the possession of the defendant not yet having been collected by them from the debtors owing the same, and that judgment be given complainant against defendants for such sum found due from the defendants to the complainant with . interest and for its costs, and for such other and further relief as the court may find it is entitled to in equity and good conscience.

## "Count III.

"(1) Complainant adopts and makes a part of this count, the same as if specifically repeated and set out herein, all of Count I and Count II except the prayers in said Counts.

"(2) Complainant further states that on June 14, 1930, the bankrupt was indebted to Home Trust Company of Kansas City, Missouri, a banking institution, in the sum of approximately $50,000.00 for cash loaned to bankrupt three or four years before said date, said indebtedness being evidenced by several notes made by bankrupt to said Trust Company, one of said notes amounting to approximately $9,700.00, which note and interest on same was long past due on June 14, 1930; that payment of said past due note for $9,700.00 or security for the payment of same was frequently demanded by said Home Trust Company from the bankrupt; that the bankrupt repeatedly refused to pay said note or give security for payment of same, but asked for a renewal of said note and through its officers and attorney, represented and assured the said Home Trust Company that at the time the bankrupt was absolutely solvent and better off than it had been at any other time previous to that date, all of which was believed by said Home Trust Company.

"(3) That, upon the refusal of said bankrupt to either pay or secure said note of $9,700.00, said bankrupt having on deposit in the Home Trust Company the sum of $7,200.00, said bank appropriated same and applied it on the indebtedness due it represented by said past due note of $9,700.00; that this appropriation made by said Home Trust Company was made before the consummation of the conspiracy entered into between bankrupt and defendants referred to herein; that the defendants and bankrupt and its officers to enable them to consummate the conspiracy mentioned herein, made a loan of $10,000.00 to the bankrupt out of which it was specifically agreed and said loan was made for the specific purpose of paying checks that had been drawn on the bank account in the Home Trust Company and issued to creditors of the bankrupt and also to pay the balance due on said past due note of $9,700.00 held by the said Home Trust Company; that said loan was made to give the holders of said checks a preference over the creditors of the bankrupt, but such purpose was unknown to said creditors.

"That said checks and the balance of $9,700.00 due the Home Trust Company were paid out of said $10,000.00 loaned by defendants to bankrupt; that at the time said loan of $10,000.00 was made to the bank-

rupt by the defendants, to-wit, on June 14, 1930, a note evidencing said loan payable on demand was made by the bankrupt payable to the order of the defendant Leon Levy.

"(4) That on June 19, 1930, within four months prior to the time of the filing of the involuntary petition in bankruptcy against the bankrupt, the defendants made a pretended loan to the bankrupt of the $3,000.00 to be used for the purpose of paying creditors and giving preferences to creditors of the bankrupt and, as evidence of the loan of $10,-000.00 mentioned herein, and as evidence of the loan of $3,000.00 claimed to have been made on June 19, 1930, the bankrupt made and executed a note for $13,000.00 payable on demand to the order of defendant Levy Meat Company and, on the same date in order to secure said note, bankrupt assigned to the defendants good accounts receivable of the face and par value of $20,942.11; that the assignment of the accounts receivable to secure the note of $13,000.00 was made at the same time that the assignment was made of $8,600.00 in accounts receivable to secure the note of $5,500.00 referred to in Count II.

"That the total amount of $13,000.00 was collected from said accounts receivable by the defendants on or before July 12, 1930, but no accounting has been made to the bankrupt or the complainant for the difference between the amount of said note of $13,000.-00 and the face value of the claims amounting to $20,942.11, and said note was never returned to bankrupt as paid.

"(5) Complainant states that the pretended loan of $3,000.00, the execution of the demand note for $13,000.00, and the securing of the same by the assignment of the accounts, as mentioned herein, was all done and made when bankrupt was insolvent and also for the purpose of hindering, delaying and defrauding the creditors of the bankrupt from collecting the debts due them and also for the purpose of giving a preference to the defendants, so that the defendants could obtain a greater proportion of their claim against the bankrupt over others of the same class; that the defendants, at the time said $3,000.00 is claimed to have been loaned to the bankrupt, and at the time it took a note for $13,000.00 and at the time the assignments of the accounts were made to them as herein stated, knew the bankrupt was insolvent and that it was anticipating the filing of a petition in bankruptcy against it and said loans, note and assignment of accounts were made to enable the bankrupt to pay other claims and debts owing by it and to give said other creditors a preference; that defendants were not bona fide holders in good faith for the value of any of said accounts.

"(6) Complainant further states that said loans were made by defendants to the bankrupt, because the bankrupt, its officers and defendants had not yet consummated the conspiracy entered into to hinder, delay and defraud creditors of the bankrupt by having the bankrupt transfer and deliver to the defendants all the assets of the bankrupt that the defendants considered necessary to establish the business as mentioned in the first count of this petition; that said loans and said assignment were made in contemplation of bankruptcy on the part of the bankrupt, and to enable the bankrupt and the defendants to consummate the conspiracy mentioned in this petition.

"Wherefore, complainant prays the court to make an order cancelling said note for $13,000.00 and to restrain and enjoin the defendants from negotiating or transferring the said note, and further ordering defendants to make a full and complete accounting of all moneys collected and received by them by reason of the accounts assigned to them as hereinbefore mentioned and, upon the ascertainment of said amount he have a judgment for same against defendants; that an order be made on defendants to reassign and reinvest the complainant with all accounts, if any, uncollected and still due and owing by the respective debtors, and complainant further prays that he be allowed interest on the amounts found to be due him hereunder and for his costs and for such other relief as he may be entitled to in equity and good conscience."

In their answer Levy Meat Company and Leon Levy admitted the long-established business of the Levy Brothers Meat & Provision Company at the stalls in the city market house, and later in the two locations, and the relation of Forrest and Harry Levy and the brother-in-law Morris Finkelstein to the business. It was admitted that after December 1, 1929, Leon Levy was employed by bankrupt at a salary of $75 per week. It is admitted that the three Levy brothers and their sister and her husband, Morris Finkelstein, lived in and occupied the same home at 3615 Genesee street, formerly belonging to the father, Isaac Levy, for many years and still continue to do so. It is admitted that on the expiration of a ten years' lease of the market stalls to the defendant,

the city of Kansas City had issued a new lease of the stalls for one year from July 1, 1929, to July 1, 1930, in the name of Leon Levy, although the custom of the city was to allow the lessees and occupants to use the stalls as long as they continued to pay their rent and comply with the rules and regulations governing the stalls. Defendants admit also that Leon Levy did, on or about May 15, 1930, cause the defendant Levy Meat Company to be incorporated under the laws of Missouri and that all of the stock of the corporation except a few qualifying shares is owned and held by defendant Leon Levy. They admitted that on or about May 15, 1930, and within four months prior to bankruptcy, the bankrupt transferred to Leon Levy all its equipment and stock of merchandise then on hand in the stalls in the city market for $1,500, and Leon Levy thereafter transferred the same to Levy Meat Company. During the month of May, 1930, Levy Meat Company installed itself in the stalls in the market house and later in the Empire Storage Building in Kansas City and entered into the wholesale and retail meat and provision business, and still is so engaged at those places. As to the location in the Empire Storage Building it was rented for five years at $175 per month and a small amount of equipment and furnishings were purchased from bankrupt and installed in said Empire Storage Building. "If any of bankrupt's officers and employees were present at the time said equipment and furnishings were installed in said Empire Storage Company Building, they were not acting at the instance and request of the defendant Levy Meat Company (but were acting as mere volunteers)." The bankrupt did furnish and deliver tools, trucks, equipment, machinery, and furniture to Levy Meat Company at an agreed price of $650, and the bankrupt between May 15, 1930, and up to July 17, 1930, furnished the Levy Meat Company meats and provisions. The defendants admit that prior to the appointment of the receiver of the bankrupt it engaged one of the employees of bankrupt to keep its books and records. The defendants admit that prior to the appointment of the receiver the Levy Meat Company engaged and employed "one or two of the less experienced and unskilled workers" of the bankrupt and after the appointment of the trustee in bankruptcy it has employed Forrest Levy, Harry Levy, and Morris Finkelstein and one or two employees of the bankrupt.

Defendants admit the execution by Leon Levy of the guaranties to the packing companies in the aggregate amount of $10,000, and admit that the bankrupt paid its entire indebtedness to both of said companies on or about May 19, 1930. That on May 19, 1930, and May 21, 1930, Leon Levy loaned to the bankrupt the sum of $2,000 and the sum of $2,204.07, and executed two new guaranties, one to Armour Packing Company in the sum of $2,500, and another to Fowler Packing Company in the sum of $1,000, which were given for the purpose of obtaining credit for the bankrupt from said companies in the amount of each of said guaranties. That on or about June 14, 1930, the bankrupt executed and delivered to defendant Leon Levy its note for the $5,500 payable on demand covering the sum of $2,000 loaned by defendant Leon Levy to the bankrupt on May 21, 1930, and also evidencing the liability of Leon Levy on the two new guaranties made on May 23, 1930, to Armour Packing Company and Fowler Packing Company in the total sum of $3,500. It is admitted that on or about June 19, 1930, bankrupt assigned to defendant Leon Levy as security for its demand note of $5,500 good accounts receivable of the face value of $8,600, and the defendants admit that the total amount of $5,500 was collected from said accounts receivable by the defendant Leon Levy on or about July 12, 1930. It is admitted that on or about June 17, 1930, the bankrupt paid to defendant Leon Levy the sum of $2,204.07.

The defendants admit that on or about June 14, 1930, Levy Meat Company made a loan of $10,000 to the bankrupt, and between June 14, 1930, and June 19, 1930, it made two loans of $10,000 and $3,000, respectively, for which the bankrupt gave its demand note in the amount of $13,000 and secured payment by assignment of good accounts receivable in the amount of $20,942.11. They admit that the total amount of $13,000 was collected from said accounts receivable by the defendants on or about July 12, 1930.

By general and specific denials the defendants presented that they had no knowledge and no reasonable cause to believe that the Levy Brothers Meat & Provision Company was insolvent at any of the times in question in the case, nor that bankruptcy was in contemplation, nor that any of the payments or transfers would effect a preference, and they denied that any of the transfers were made with any intent to hinder, delay, or defraud creditors. Conspiracy was denied and there were many affirmative allegations explaining and justifying the ad-

mitted transactions. It was alleged that the defendants had paid the bankrupt full value for everything obtained from it, but that the privilege which the bankrupt had had to rent and occupy the stalls at the city market house was of no appreciable value when the lease was taken in the name of Leon Levy.

Leon Levy alleged by way of counterclaim that he had loaned to the bankrupt between April 7, 1928, and July 18, 1930, various sums of money at divers and sundry times aggregating the sum of $24,557.09 and that after allowing credit for payments made the bankrupt was still indebted to him on account of such loans in the sum of $3,425.-14. In a second count of counterclaim he alleged that the bankrupt was indebted to him in the sum of $5,000 on account of a deposit of $5,000 which he made with the Cudahy Packing Company at the request and for the use of the bankrupt to guarantee its accounts, which had not been returned to him.

The trial court found as to the issues under count I as follows:

"1. I find the fact to be that Levy Brothers Meat & Provision Company was adjudicated a bankrupt July 17, 1930 and complainant thereafter was duly elected and qualified as trustee in bankruptcy of the bankrupt.

"2. I find the fact to be that the assets of the bankrupt in possession of the trustee are insufficient to pay the debts of the bankrupt and that the proceeds of the sale of such assets will not pay in excess of 30% of the bankrupt's liabilities, which liabilities amount to the sum of $62,780.89.

"3. The defendant Levy Meat Company is a corporation solely owned by the defendant, Leon Levy. Leon Levy is a brother of Forrest Levy and Harry Levy and a brother-in-law of Morris Finkelstein. That at the time of the adjudication in bankruptcy of Levy Brothers Meat & Provision Company and for a long time prior thereto Leon Levy had no interest in that company. The principal officers and stockholders of the company were then and for a long time had been Forrest Levy and Harry Levy and Morris Finkelstein.

"4. Prior to the adjudication in bankruptcy and within four months thereof the bankrupt transferred to Leon Levy and the Levy Meat Company certain of its assets, including machinery, furniture, equipment and merchandise in certain stalls in the City Market, being the stalls referred to in the petition in this case, and also other assets of the bankrupt, including merchandise, furniture, fixtures, trucks, etc., but all of said assets so transferred were transferred for an adequate consideration representing their fair value paid to the Levy Brothers Meat & Provision Company.

"5. The interest of the bankrupt, if any, in the right to occupy the stalls at the City Market, referred to in the petition, was not, at the time that right was surrendered by the bankrupt and taken over by defendant Leon Levy an asset of the bankrupt having any pecuniary value.

"6. The good will of the bankrupt and lists of its customers were not transferred by the bankrupt to the defendants before the date of the adjudication in bankruptcy or any other time.

"7. It has not been proved that any understanding, agreement or conspiracy was had by or entered into between the defendants and the officers of the bankrupt and there was no such understanding, agreement or conspiracy to transfer to the defendants any of the assets of the bankrupt for the purpose of defrauding any of the bankrupt's creditors, whether in anticipation of bankruptcy or otherwise."

As to the issues under count II the trial court found:

"1. The bankrupt had accounts with various packing companies as alleged in the second count of the petition, which accounts had been guaranteed by Leon Levy. The indebtedness of the bankrupt to the packing companies was discharged by the bankrupt, which the bankrupt was enabled to do with funds loaned to the bankrupt by Leon Levy for that purpose. Leon Levy was thus relieved from the obligation of his guaranties for the money loaned by him to the bankrupt. He took the bankrupt's notes and as security for its notes an assignment of certain of its accounts receivable. From the proceeds of these accounts receivable the indebtedness of the bankrupt to Leon Levy evidenced by the notes has been discharged. It has not been proved, however, that at the time of the loans, the execution of the notes and the assignment of accounts Leon Levy knew that the bankrupt was insolvent or contemplating bankruptcy."

"The transactions had were not for the purpose or with the intent of giving Leon Levy a preference over other creditors of the bankrupt."

As to the issues under count III the trial court found:

"1. Loans were made (as alleged in Count III of the petition) by Leon Levy to the bankrupt the total amount of which was $13,000.00. The bankrupt gave Leon Levy notes for the amounts loaned and assigned to him accounts receivable as security for the notes. Out of collections on the assigned accounts receivable the notes have been paid. When the notes were given and the accounts receivable were assigned Leon Levy had no knowledge that the bankrupt was insolvent, the transactions were not had in contemplation of bankruptcy, in furtherance of any conspiracy to defraud the bankrupt's creditors, nor for the purpose or with the intent of giving Leon Levy a preference."

The court found as its conclusion of law that the trustee has not proven facts entitling him to the relief sought in either of the three counts of the bill, and therefore that the bill should be dismissed. The counterclaims were dismissed on the ground that the plaintiff having failed to recover there could be no recovery on the counterclaims.

Under appropriate assignments of error the trustee in bankruptcy contends that the evidence proved that Leon Levy, as well as his brothers and brother-in-law, did, at all times in question, know that the Levy Brothers Meat & Provision Company was insolvent and would inevitably go into bankruptcy; that he did conspire with his brothers and brother-in-law in anticipation of bankruptcy to secure the assets and good will and business of the corporation for the family in fraud of the corporation's creditors, as alleged in the petition; that the conspiracy was fully consummated; and that preferential transfers and payments were taken by the defendants from the bankrupt, voidable under the Bankruptcy Acts. The evidence taken on the trial sustained the allegations of the petition which detail the several transfers, payments, and releases of guaranties between the bankrupt and Leon Levy and the Levy Meat Company, but determination of the crucial questions as to the intent and knowledge of the defendants depend upon the inferences to be drawn from the transactions themselves as well as from the testimony of the participants. The contention of the appellant that the trial court erred in finding that it had not been proved that Leon Levy knew that the bankrupt was insolvent or contemplated bankruptcy at the time alleged compels review of the evidence by this court. We consider first the testimony concerning what the financial condition of the Levy Brothers Meat & Provision Company was and then the knowledge and intent of the defendants.

It appears without question that for at least a year prior to bankruptcy the Levy Brothers Meat & Provision Company was encountering serious financial difficulties brought on by the expansion of the business from the market stalls into the new additional location. The cost of the new location had amounted to around $285,700, and the fixed charges which the bankrupt was required to pay on account of its occupancy of the entire building amounted to around $1,800 per month. It is also clear that in order to meet the enormous outlay of money occasioned by the expansion, Forrest and Harry Levy and Morris Finkelstein had exhausted every possible resource to raise money. The mortgage loan on the new location was $125,000 and the lien covered all the fixtures and equipment; $50,000 had been borrowed from the Home Trust Company Bank; the officers had mortgaged properties in which relatives were interested and that money had been put into the business. Harry Levy testified: "I put everything I owned into the business, even including my life insurance upon which I borrowed its face value." And, as stated in the brief of appellees, "the testimony shows that Forrest and Harry Levy and Morris Finkelstein put * * * —every dollar they had in the world—into the business at 31st and Gillham Road." They had also induced their brother Leon Levy to obligate himself in the sum of $10,000 as guarantor of their purchase accounts at the Armour and Fowler packing houses and Mr. Sittenfeld had also deposited securities to guarantee the purchase account with the Swift Packing Company. The building at the new location had been built and equipped for a very complete food market including a bakery for wholesale and retail production, a grocery, delicatessen, and fish and oyster service; but after a year or two the various departments were discontinued as unprofitable and the elaborate and costly plant was utilized for the meat and provision business only. The expanded business lost money every year up to 1929, and although there was apparently a slight gain shown by the books in 1929 up to September 30th, there were items left out of the bookkeeping in the way of losses in bad accounts that were of uncertain amount and the rent charge was carried at $1,000 per month although the fixed expense of the building was $1,800 per month. The bank account was overdrawn constantly for over a year and checks were being re-

turned by the bank for insufficient funds. The debts of the company could not be met when they matured. Foreclosure of the mortgage on the new location and the equipment therein was begun in February, 1930, the bankrupt being then many months in arrears on its payments, and shortly after bankruptcy the whole property was sold for less than the mortgage. The schedules in bankruptcy showed assets of $150,074.13 against total debts of $62,780.89, but the receiver and trustee was able to realize only $25,800.99 from all the assets including $2,600 which he collected from accounts receivable that had been assigned by bankrupt to Sittenfeld. There was $4,446.28 cash on hand and deposited in banks. Between seventeen and eighteen thousand dollars was collected on the accounts receivable, and the trustee at the time of the trial had only $16,427.93 of uncollected receivables, out of which "he would be able to get very little." The amount obtained from merchandise inventoried at $12,156.61 was only $2,854.71. The unsecured creditors whose claims amounted to $62,780.89 had received only 20 per cent. of their claims.

While it is true that the adjudication of bankruptcy creates no presumption of insolvency previous to that time, yet a condition of hopeless insolvency on a given date of a going mercantile concern conducting business in the ordinary course is strong evidence of insolvency a short time before, and this is especially true when no unusual event that would bring about a sudden condition of insolvency is shown to have occurred within the period. In re Elmira Steel Co. (D. C.) 109 F. 456; In re Brigham's Estate, 144 Iowa, 71, 120 N. W. 1054; Campbell v. Park, 128 Iowa, 181, 101 N. W. 861, 104 N. W. 799; State v. Bevins, 210 Iowa, 1031, 230 N. W. 865; State v. Cadwell, 79 Iowa, 432, 44 N. W. 700; 22 Corpus Juris, § 30, p. 192. The bankrupt's schedules in bankruptcy showed a large excess of assets over liabilities, but the company was actually insolvent because the receivables and the inventory of merchandise on hand were grossly exaggerated. There is evidence that financial statements of the company's condition were made as of September 30, 1929, and December 31, 1929, and in each an excess of assets over liabilities appeared. The excess in all instances, however, was produced by including on the asset side of the statement large amounts for inventoried merchandise and stock on hand and for accounts receivable. The inventories themselves were not offered in evidence nor checked by the bookkeepers or the accountant. As to the accounts receivable there were $25,000 more than three months old and some of them two or three years old. Of the $72,000 in accounts appearing on the financial statement of September 30, 1929, only $62,000 were due in ninety days or less. The value of the new building and equipment at Thirty-First and Gillham had fallen below the amount of the mortgage thereon in the latter part of 1929, and the bankrupt's claim against the Levy Building Company carried in the books and statements at $87,450.73 was of no value. The margin of excess of assets over liabilities to be deduced from the financial statement of September 30, 1929, eliminating the item of $87,450.73 (claims against the Building Company), was $33,671.08. Considering the very great volume of gross business, the continuous losses sustained, and the uncertain elements in the accounts receivable and inventory, the margin of solvency, if there really was any, was very precarious when the financial statement was made.

If there was, in fact, a narrow margin of solvency in the year 1929, it is clear that the steps which the officers of the corporation took after the examination of its affairs by public accountant Weaver, completed in October, wiped out any possible margin. They had, up to that time, not only devoted their every energy to the business but had drawn out very little for themselves by way of salaries or otherwise; but in October they reversed that policy and voted a salary of $75 per week to Leon Levy, an increase of $30 per week to a nephew, and an aggregate of $195 per week to the two Levy brothers and Morris Finkelstein, a total increase of salary obligation of more than $15,000 per annum. They also provided by resolution of the board of directors that the officers of the company might from time to time borrow money from the company with the consent of all the directors; and under this resolution there was more than $7,000 taken out of the company before bankruptcy. The board of directors also passed a resolution that the house account for meat and provisions delivered to 3615 Genesee street, Kansas City, Mo. (the home of the directors), should be additional compensation to the officers of the company for their services. The policy of putting everything into the business and taking out the least possible is demonstrative of honest faith in the business, but the change of policy and the imposition of these heavy burdens upon the company for the benefit of the officers when

the company was commercially insolvent and unable to keep its checks from being dishonored, its bank account balanced, or its bills paid, reflect clearly the feeling of the officers that the condition of the company had become hopeless, and that bankruptcy was inevitable. Corroboration of this attitude of the officers is found in the further steps taken by them in the two-month period preceding the bankruptcy. From early in 1929 until that time the bankrupt had had the benefit of Leon Levy's guaranties of its purchasing accounts at the packing houses. But in May and June of 1930 Leon Levy and his brothers and brother-in-law succeeded in having the guaranties satisfied and Leon Levy released. The discharge of Leon Levy from his guaranties was accomplished by application of the proceeds of good accounts receivable to the packing house accounts, whereby the resources of the bankrupt were reduced to the full extent of the guaranties. The company could not meet its bills or save its checks from being refused when it had the benefit of the guaranties without cost, and it was obvious that the withdrawal of the guaranties and application of its accounts receivable to the debts would further cripple it. The assets of the company available for use in the business were further drained from it in June, 1930, when its deposit in bank and its good accounts receivable were applied to its debts to the bank and to creditors to whom checks had been drawn, under circumstances precluding any further expectation of credit from the bank.

We are convinced that the Levy Brothers Meat & Provision Company was insolvent on July 16, 1930, at the date of bankruptcy and that the condition of insolvency had existed at least from the first of May prior thereto and that bankruptcy when it occurred had been long anticipated by the officers.

The extent to which Leon Levy had knowledge of the condition of the bankrupt must be determined from the circumstances and the transactions in which he participated. His mere denial of knowledge is not conclusive. The evidence is that although Leon Levy had sold out his interest in the Levy Brothers Meat & Provision Company to his brothers and brother-in-law in 1923, he did not lose touch with the business. He disapproved of the expansion of the enterprise at Thirty-First and Gillham road and doubtless feared its consequences, but he was about the business practically every day when in the city, always got his mail at the company offices, and helped in the business in

many ways. He has always lived at the same home with the brothers and brother-in-law, and they have always discussed business matters at the table from day to day. As Harry Levy says, they had nothing to conceal from their brother Leon. The consociation of the members of the family was intimate and their interests very close. Leon became obligated in the sum of $10,000 as guarantor to the packing houses for the purchasing account of the bankrupt early in 1929 and he continued under that obligation close to the time of bankruptcy. When Mr. Sittenfeld (who was also a guarantor of the bankrupt to the packing house) caused a public accountant, Weaver, to examine into the condition of the company in the summer of 1929, Leon Levy says he was about the place and saw Weaver at work and inquired what he was doing, though he says he did not ask for or ascertain the results. It is not credible that while he was on the ground and interested as he was that he let the information obtained by Weaver go to Sittenfeld and the brothers without getting it himself. Although Leon Levy denied that he knew of the real condition of the company or of its insolvency or impending bankruptcy, the background of his life-long experience in the business and close association with his brothers and brother-in-law and actual participation in the business as employee and guarantor of its purchases must be considered in connection with his dealings with the company's assets.

It appears that up to May, 1930, before the bankruptcy of July 17th, the bankrupt carried on its business at two locations. The stalls in the city market were the old-established location of the business where it had been carried on many years by the father, Isaac Levy, who passed it on to his eldest son, Leon Levy, and he, in turn, had vested it in his brothers and the husband of his sister.

The record discloses a long series of transactions between the bankrupt and Leon Levy as the ultimate result of which Leon Levy was released without having to pay anything on his $10,000 guaranty to the packing houses and by which he acquired for a very small payment to the bankrupt two meat market locations sufficiently similar to those used by the bankrupt to enable him to take over and continue the business theretofore carried on by the bankrupt, practically without interruption. Manifestly, the substitution of the defendants for the bankrupt in the conduct of the very extensive meat business of the bankrupt was not a fortuitous happen-

ing, but resulted from concerted and continued effort of the brothers and the brother-in-law to accomplish what they did accomplish. We look to the transactions and circumstances for the proof that Leon Levy knew of the insolvency and anticipated the bankruptcy of the Levy Brothers Meat & Provision Company at the times in question.

The first transaction in the series of transactions was the permission gratuitously accorded to Leon Levy by the bankrupt to take the lease of the market stalls in his name. There is testimony that Leon Levy was permitted to take the license to occupy the stalls in his own name because his younger brothers thought the location was worthless and that some deterioration had taken place in the stalls as a location for a wholesale and retail meat business and one of the Levy brothers testified that the business was done at a loss at the city stalls. On the other hand, it appears that the volume of the business done at the stalls in 1929 amounted to $400,000 and no figures or accounts were offered to show that it was done at a loss. The bankrupt continued to carry on the business at the market stalls until May 15, 1930, and during the previous winter and fall it expended between five and six thousand dollars to renew and improve the fixtures and equipment for the business use. These expenditures were made notwithstanding the lease stood in the name of Leon Levy at the time. The volume of business done and the continuation of the business and outlay of money upon the location entirely refute the claim that the location was valueless. Although the city has discontinued its policy of granting leases to the market stalls, the tenure of licensed occupants is none the less secure as alleged in the petition. Leon Levy should be deemed to have taken the license to occupy the stalls in his own name for the use and benefit of the bankrupt, to whom the right belonged, and his taking the license in his name is a significant circumstance bearing on his knowledge of the condition of the bankrupt and his expectation, long in advance of the bankruptcy, that the bankrupt would discontinue at least that very substantial part of its business which was carried on in the city stalls.

We next consider the circumstances under which the bankrupt did discontinue its business at the market stalls and turned its physical properties at that location over to Leon Levy on May 15, 1930, two months before bankruptcy. It appears that the bankrupt had assisted in selecting a location for the Levy Meat Company in the Empire Storage Building and had equipped it with its own furniture and fixtures and with its own labor at about the same time that Leon Levy and the Levy Meat Company started business at the city market stalls. It is apparent that the purpose of the brothers was to provide Leon Levy with the two locations in order that he could more nearly approximate the physical means of carrying on the business that the bankrupt had had and could more readily appropriate the going business of the bankrupt as a whole. Regardless of the inadequacy of price paid by Leon Levy for the property at the market stalls or at the Empire Storage Building, the nature of the transactions—sales in bulk without notice to creditors (sections 3116, 3117 and 3127, Rev. St. Mo. 1929 [Mo. St. Ann. §§ 3116, 3117, 3127, pp. 1942, 1946, 1967, 1968]) —as well as the circumstances, point strongly to the conclusion that the bankrupt was intending to go out of business, immediately and at the moment of transfer at the market stalls, and very soon at the Thirty-First and Gillham location.

The inference is confirmed by other circumstances disclosed by the testimony in connection with the business of the Levy Meat Company and Leon Levy as it was carried on prior to the bankruptcy of the Levy Brothers Meat & Provision Company.

The testimony shows that the stock of meat with which the defendant Levy Meat Company went into wholesale and retail meat business came largely from the bankrupt, and there is substantial proof that the bankrupt furnished the meat at prices below the cost. It appeared that the duplicate copies of many of the sales tickets containing the record of sales of meat by bankrupt to defendant Levy Meat Company contained notations not appearing on the tickets in possession of defendants. For example, a ticket originally reading "beef hind quarters" would have the word "cow" inserted, and on other tickets the added word or notation such as "frozen," "bull," "med" (medium?) etc. In each instance the ticket as it stood originally without the insertion invoiced meat that commanded a higher price than the ticket with its added word. Exhibits offered contain lists of sales of meat going to defendants and comparisons with the prices of similarly described meats sold to other customers. Also comparisons between prices charged defendants and the prices paid to the packing companies. It was clear that in the numerous sales listed the prices to defendants were lower than to other customers and lower than cost to the bankrupt.

It is also in evidence that as a part of the transactions by which the defendants were put into possession of the going business of the bankrupt, the defendants acquired three automobiles, two Chryslers, and a Marmon, belonging to the bankrupt by the expedient of defaulting a monthly payment to the finance company and suffering the finance company to transfer the title to the defendant (in the name of his realty company) for the exact amount of unpaid installments. It is also shown that a few days before bankruptcy and on the very day the cars were transferred to Leon Levy's realty company, the bankrupt spent $524.25 to equip the cars completely with new tires. It also appears that on July 7, ten days before bankruptcy, Leon Levy paid the bankrupt $465 for three trucks. On the same day the bankrupt had made final payment of $221 on one of the trucks so transferred.

There was testimony that on July 11th, a few days before bankruptcy, bankrupt delivered to defendants at the Empire Storage Building four tierces of pickled tongues and charged 15 cents per pound for eight hundred pounds. The evidence is that the four tierces weighed several hundred pounds more than eight hundred pounds and the market price was then 32 cents per pound. The price at the packing house was 22 cents per pound.

The evidence shows also that the officers of the bankrupt did the buying of meat for the defendant Levy Meat Company. Bankrupt's bookkeeper kept the books for defendant. The bankrupt's salesman went to soliciting the trade for the defendant Levy Meat Company in the middle of May, 1930, and at the same time the bankrupt turned over 50 per cent. of its accounts receivable to the defendant, declining to sell further to the customers who owed the accounts but assisting the defendant Levy Meat Company to sell to them.

In this connection, the adoption of the name Levy Meat Company is very significant. Undoubtedly, throughout the long course of years in which the name Levy had become identified with the meat business in Kansas City, the two additional words in the bankrupt's name "Brothers" and "Provisions" were commonly elided or ignored, and the name "Levy Meat Company" assimilated the new company completely to the old in common thought. Expectation that the old company would cease is clearly reflected.

It appears also that Harry and Forrest Levy and Morris Finkelstein and wife transferred their three-sevenths interest in the home to Leon Levy shortly before the bankruptcy, and testimony was given that the consideration was, in part, that Leon Levy would provide a home for them. Inasmuch as their combined salaries from the business at that time exceeded $15,000 a year, the transaction corroborates that the parties knew the business and the salaries were to cease.

The transactions whereby the bankrupt, through the assistance and by means of advancements made by Leon Levy, secured the discharge of Leon Levy from his guaranty to the packing houses without any payment by Leon Levy and the further transactions by which the checks of the bankrupt issued to certain of its creditors were taken up with moneys furnished by Leon Levy for the purpose are elsewhere considered. The substantial resources of the company for the carrying on of the business of the company and the payments of its debts were its accounts receivable. In each of these transactions the accounts receivable were assigned to Leon Levy, withdrawn from general use in the business, and the proceeds applied to the discharge of the debts owing to certain creditors. The transactions tend to prove knowledge of insolvency and anticipation of bankruptcy on the part of Leon Levy.

Another circumstance is the taking of a weekly salary by Leon Levy. When the officers of the company changed the policy of putting everything they had or could borrow back into the business and voted instead to increase their salaries nearly threefold, Leon Levy joined in the change of attitude. He had been actively assisting in the business up to that time, contenting himself with the help he could give to it, receiving no salary and no security for advances or indemnity for his guaranty. His change of attitude and demand for $75 per week salary immediately after the public accountant had made his financial showing and in the midst of the difficulties of the company are as significant as the conduct of the officers at the same time. The action of all was concerted and joint and only explainable because they all, including Leon Levy, foresaw the closing of the business and were anticipating it.

The only fair inference that can be drawn from the whole course of Leon Levy's transactions with the bankrupt is that Leon Levy shared with his brothers the knowledge that the Levy Brothers Meat & Provision Company was insolvent, and that he engaged in the transactions with them in anticipation of bankruptcy.

Although the brothers Levy strenuously maintain that the transfers of the business locations, physical equipment, and business from the bankrupt to defendants were in good faith and in the expectation that the defendants would simply become competitors of the bankrupt, we think the proof shows to the contrary that the common understanding and intention was that things should take the course which they did take; that the Levy Brothers Meat & Provision Company would speedily go into bankruptcy and the defendants would have the business and the necessary property to carry it on for the family. The court cannot find that such a course of dealing between the family members of a single household was carried out without knowledge or complicity on the part of all.

Being satisfied that the Levy Brothers Meat & Provision Company was insolvent as alleged in the amended petition, and that the defendants engaged in the various transactions referred to with full knowledge of such insolvency, and in anticipation of bankruptcy, and that the transactions were all carried out in furtherance of common understanding and purpose to vest the physical properties and the going business of the bankrupt in the defendants for the benefit of the family, we next consider the allegations of the first count to the effect that the prices paid by Leon Levy for the properties taken by him from the bankrupt were not fair consideration. It appears that he paid $1,500 for the fixtures, equipment, stock of merchandise, and $25 cash in the till at the market stalls location; that he paid $650 for the equipment at the Empire Storage Building; and that he paid $450 for the automotive equipment. As to each of these purchases made by Leon Levy from the bankrupt, the evidence is that the bankrupt had expended considerable sums of money upon the property shortly before the sale to Leon Levy. Such was the case as to the equipment at the market stalls, renewed during the fall and winter prior to the transfer; the automotive equipment; and the equipment at the Empire Storage Building, which was installed in the building with the labor and at the charge of the bankrupt immediately before the sale and the bankruptcy.

Although the testimony taken at the trial does not clearly establish just what the value of the properties taken over by the defendants was, the proof is clear that the assets transferred were at the time of transfer and continued to be used as a part of a going business and that the prices paid were grossly inadequate.

We conclude that the transfer to the defendants of the possession of the stalls at the city market house and of the merchandise, fixtures, and equipment therein, was a transfer in fraud of the creditors of the bankrupt and was void as against the trustee in bankruptcy; that the decree of the District Court as to the first count be reversed and remanded, with directions to enter decree on said first count finding such transfers to be null and void and according to the plaintiff such relief as to the trial court may appear just and equitable, not inconsistent with our conclusions.

The transactions relied on in the second count of the amended petition occurred in May, 1930, immediately preceding bankruptcy in July, 1930, and were carried out simultaneously with the other steps by means of which the very extensive going business of the bankrupt was kept in operation approximately in its entirety and in the hands of the Levy family. We think the trial court correctly found the facts shown by the evidence except that we find that Leon Levy did know at the times referred to that the bankrupt was insolvent and contemplating bankruptcy. The testimony has satisfied us that the officers of the bankrupt acted in concert with the brother Leon Levy in using the good accounts receivable of the bankrupt and the cash money advanced by Leon Levy to pay off the accounts of the Armour and Fowler Packing Companies for which accounts Leon Levy was guarantor. When the payments were made the common purpose and the effect were to relieve Leon Levy from any obligation to pay anything on his guaranty. The evidence is that by reason of its daily purchases of meat there was at all times a debt of the bankrupt to the packing companies in the amount of Leon Levy's guaranties, so that Leon Levy was a creditor of the bankrupt within the preference provisions of the Bankruptcy Acts. The release of Leon Levy from his liability as guarantor to the packing houses was not accomplished in a single transaction. He made the several loans and took security at different times as described in the amended petition, but it is apparent from the testimony that the different steps were all taken to accomplish the single purpose of relieving him from liability on his guaranties. As he knew of the insolvency at the time and anticipated the bankruptcy, we find that he received a

preference in the full amount of his two guaranties, to wit, $10,000, and the trustee is entitled to recover for the same. In re Schleicher Printing Corp. (C. C. A. 2) 62 F.(2d) 503; Paper v. Stern (C. C. A. 8) 198 F. 642; Kobusch v. Hand (C. C. A. 8) 156 F. 660, 18 L. R. A. (N. S.) 660; Bartholow v. Bean, 18 Wall. (85 U. S.) 635, 2 L. Ed. 866.

The steps taken by Leon Levy to get himself relieved from his $10,000 guaranty to the packing houses are also significant on the question of his knowledge of the condition of the bankrupt and that its bankruptcy was anticipated. The guaranties furnished to the packing houses by Mr. Sittenfeld and Leon Levy were essential to the operation of its business by the bankrupt. The testimony shows plainly that the guarantors were relieved immediately before the bankruptcy and Leon Levy participated in the accomplishment of his relief by advancing some of the money. He took the company's good receivables of the face value of more than $8,000 to secure himself in connection with the transactions which were had on the eve of bankruptcy and concurrently with the transferring of the bankrupt's business and assets, already discussed. The difficulties of the bankrupt while it had its purchasing accounts guaranteed and its good receivables available for use in the business have been considered. It is not credible that Leon Levy thought the bankrupt would survive the withdrawal of the guaranties and the transfer of the good receivables.

We conclude that the decree of the District Court dismissing the second count of the petition should be reversed and the case presented on that count remanded, with directions to find a voidable preference as alleged in the count.

The matters involved in the third count of the amended petition also are directly relevant to the inquiry into Leon Levy's knowledge and anticipation of the bankruptcy. The upshot of the matters there involved was that Leon Levy took over a pledge of good accounts receivable from the bankrupt of the face value of $20,000 and collected $13,000 from them very close to the time of bankruptcy. The funds which Leon Levy advanced to the bankrupt at the time were to take up outstanding checks issued to certain of its creditors by the bankrupt, and the transactions terminated the credit which the bankrupt had theretofore used at the bank in the amount of many thousands of dollars. Leon Levy then knew of the bankrupt's loss of the guaranties it had had and of the bank credits and the transfers of its receivables and business and had himself taken such large part in all the winding up transactions that knowledge of impending bankruptcy was brought directly home to him.

The allegations of the third count of the amended petition to the effect that Leon Levy loaned the bankrupt $13,000 for the purpose of enabling the bankrupt to pay certain of its creditors in full were sustained by the evidence. It was also proved that the bankrupt assigned its good accounts receivable to Leon Levy to secure the loan of $13,000 and that the same was repaid by collection of the accounts. As we have found that Leon Levy then knew of the insolvency and imminent bankruptcy of the Levy Brothers Meat & Provision Company, we must further find that the transfer of the bankrupt's good accounts receivable to pay certain of its creditors to the exclusion of other creditors was a transfer the effect of which was to deprive creditors of the benefits sought to be secured by the Bankruptcy Acts and one which hindered, delayed, and defrauded the general creditors within the meaning of section 67e of the act, as amended (11 USCA § 107 (e). Dean v. Davis, 242 U. S. 438, 37 S. Ct. 130, 61 L. Ed. 419; Buffum v. Peter Barceloux Co., 289 U. S. 232, 53 S. Ct. 539, 77 L. Ed. 1140; Lincoln Theatres Corp. v. Fleming (C. C. A. 4) 66 F.(2d) 446; Hertzmark v. Lynch (C. C. A. 1) 54 F.(2d) 38; McAtee v. Shade (C. C. A. 8) 185 F. 442; Parker v. Sherman (C. C. A. 2) 212 F. 917; Lumpkin v. Foley (C. C. A. 5) 204 F. 372. The defendants should be required to account for the proceeds of the accounts receivable collected in the amount of $13,000.

The decree of the District Court as to the third count of the amended petition is reversed and that count is remanded, with directions to find as to the third count that there were transfers amounting to $13,000 to the defendants in fraud of creditors within the meaning of section 67e of the Bankruptcy Act, as amended (11 USCA § 107 (e), as alleged in the third count of the amended petition, and to decree accordingly.

The decree dismissing the counterclaims of Leon Levy is also reversed, with instructions to reinstate the same and to try the issues arising thereon.

**Decree reversed.**